[No. A089841. First Dist., Div. Two. July 10, 2001.]

KELI CWYNAR et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

638

642

**COUNSEL**

Nielsen, Merksamer, Parrinello, Mueller & Naylor, John E. Mueller; Herzig & Berlese and Barbara E. Herzig for Plaintiffs and Appellants.

Louise H. Renne, City Attorney, and Andrew W. Schwartz, Deputy City Attorney, for Defendant and Appellant.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

Proposition G is a San Francisco ordinance that restricts a property owner's ability to evict a tenant from a residential rental unit so that the unit can be used as a residence by the owner or a close family member. Several property owners and three associations (plaintiffs) sued the City and County of San Francisco (the City) and others alleging, among other things, that Proposition G is unconstitutional on its face and as applied to them.

The superior court sustained a demurrer without leave to amend as to each of the causes of action challenging the constitutionality of Proposition G. We find that plaintiffs have alleged, or may well be able to allege, sufficient

facts to support their claim that Proposition G constitutes a taking of their property without just compensation in violation of the state and federal Constitutions. Therefore, we reverse the part of the judgment that is based on the trial court's ruling sustaining the demurrer without leave to amend.

## II. STATEMENT OF FACTS

### A. *Proposition G*

The grounds pursuant to which a City landlord may recover possession of a residential rental unit from a tenant are set forth in section 37.9 of the San Francisco Residential Rent Stabilization and Arbitration Ordinance. (S.F. Admin. Code, ch. 37, § 37.9 (hereafter section 37.9).) At a November 1998 election, the voters of the City enacted Proposition G, which amended section 37.9 by restricting the ability of an owner of residential rental property to evict tenants to enable the owner or owner's relatives to move into a rental unit.

Before Proposition G was passed, section 37.9 generally provided that any landlord with a sufficient ownership interest in a building could recover possession of a rental unit for use as a principal residence by the owner or owner's close relative for a period of at least 12 continuance months. Section 37.9 also contained a "temporary moratorium" precluding evictions of certain categories of elderly, disabled or catastrophically ill tenants so that the owner could use units occupied by those tenants as a principal residence for the owner or owner's close relative.[1]

Proposition G amended section 37.9 by, among other things, imposing the following restrictions:

(1) The one-owner-occupancy-per-building restriction: A landlord may recover possession of a rental unit "[f]or the landlord's use or occupancy as

---

[1]The City asks us to take judicial notice of certain "findings" by the City Board of Supervisors which led to the enactment of this temporary moratorium. The City also asks us to judicially notice the arguments in favor of Proposition G that were included in the City's voter information pamphlet. This information is of only limited relevance to the issues on appeal. Furthermore, the City did not request the trial court to take judicial notice of this same information. The City's request for judicial notice is, therefore, denied, as is a similar request by plaintiffs of, also, information not presented to the trial court. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444 & fn. 3 [58 Cal.Rptr.2d 899, 926 P.2d 1085]; *Goehring v. Superior Court* (1998) 62 Cal.App.4th 894, 910 & fn. 5 [73 Cal.Rptr.2d 105]; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185 & fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261].) However, and as we note below (see p. 661, *post*), notwithstanding our denial of the City's request, we do not question the City's premise that the San Francisco rental housing market presents problems of an acute nature.

his or her principal residence for a period of at least 36 continuous months." (§ 37.9, subd. (a)(8)(i).) "Once a landlord has successfully recovered possession of a rental unit" for use as his or her principal residence, "no other current or future landlords may recover possession of any other unit in the building" for this purpose. (§ 37.9, subd. (a)(8)(vi).) This restriction substantially altered the property owner's previously unqualified right to recover a unit for purposes of owner occupancy. Indeed, one owner's exercise of the right to recover possession for owner occupancy can effectively extinguish this right with respect to all other current and future owners of the building.[2]

(2) The family occupancy restriction: A landlord may recover possession of a rental unit for use or occupancy as a principal residence of a landlord's close relative "for a period of at least 36 months, in the same building in which the landlord resides as his or her principal place of residency, or in a building in which the landlord is simultaneously seeking possession of a rental unit." (§ 37.9, subd. (a)(8)(ii).) This restriction also substantially altered a previously unqualified right. Under this provision, an owner can recover possession of a unit on behalf of a family member only if the owner will also live in the building.

(3) The tenant protection restriction: A landlord may not recover possession of a rental unit for use as a principal residence by the landlord or the landlord's relative if any tenant in the rental unit is (a) 60 years of age or older and has lived in the unit for 10 or more years, or (b) "disabled" and has been residing in the unit for 10 or more years, or (c) "catastrophically ill" and has been residing in the unit for 5 or more years. (§ 37.9, subd. (i)(1).) This restriction made permanent the temporary moratorium set forth in the prior version of section 37.9.[3]

Section 37.9 applies to all landlords and tenants of rental units which are broadly defined as "[a]ll residential dwelling units in the City . . . together with the land and appurtenant buildings thereto, and all housing services,

---

[2] An expressed intention of the one-owner-occupancy-per-building restriction is that the first unit recovered from a tenant pursuant to this provision is to be the only unit in the building that may ever be recovered from a tenant for purposes of owner occupancy. However, the regulation provides that if "a disability or other similar hardship" prevents a landlord from occupying the unit previously designated as the landlord unit, he or she may file a petition with the rent board or commence eviction proceedings with respect to a different unit. (§ 37.9, subd. (a)(8)(vi).)

[3] This restriction does not apply (a) to a landlord who owns only one rental unit in a building or (b) when all of the units in the building owned by the landlord (other than the landlord unit) are occupied by tenants who would be protected from eviction by this restriction and the landlord seeks to recover possession of a unit to use as a residence for a qualified family member who is 60 years of age or older. (§ 37.9, subd. (i)(2).)

privileges, furnishings and facilities supplied in connection with the use or occupancy thereof, including garage and parking facilities." (S.F. Admin. Code, § 37.2, subd. (r).) Several categories of housing accommodations are expressly excluded from this definition, and therefore not subject to Proposition G. For example, the statutory definition excludes various forms of temporary housing, such as hotels, motels, and hospitals, and certain types of government-regulated housing. Perhaps the broadest category of excluded housing is rental units in a structure for which a certificate of occupancy was first issued after June 13, 1979. (S.F. Admin. Code, § 37.2, subd. (r)(5); S.F. Residential Rent Stabilization & Arbitration Board Rules and Regs., § 1.17, subd. e.) Thus, the Proposition G restrictions do not apply to residential rental property built after June 1979.

In its brief to this court, the City stated that Proposition G applies only to residential rental properties with three or more units. The City then filed an "Errata Re Respondent's Brief" in which it stated that Proposition G applies to buildings with two or more units. At oral argument, however, the City concurred with plaintiffs' contention that single-family dwellings are not excluded from the definition of rental units to which section 37.9 applies. (S.F. Admin. Code, § 37.2, subd. (r)(5).)

A tenant or the City rent board may bring a civil action for damages and other relief against a landlord who allegedly violates section 37.9. A violation of section 37.9 can also constitute a misdemeanor. (§ 37.9, subds. (e) & (f).)

B. *The Complaint*

On April 27, 1999, plaintiffs filed a first amended petition for writ of mandate and other relief and complaint for injunctive and declaratory relief and for damages for inverse condemnation (the complaint). In addition to challenging Proposition G, plaintiffs also alleged that section 209.10 of the San Francisco Planning Code (hereafter section 209.10) was invalid for several reasons. Section 209.10, an ordinance which the lower court ultimately found to be invalid, imposed restrictions on a landlord's right to remove his or her property from the rental market by, among other things, requiring certain owners to obtain conditional use permits before converting their property to residential nonrental housing.[4]

---

[4]The lower court ultimately ruled that section 209.10 was invalid. The City appealed that ruling but has since abandoned that appeal. Thus, whether section 209.10 was valid is not an issue on appeal. Nevertheless, our summary of the pleadings and the lower court's rulings

## 1. *The plaintiffs*

Plaintiff Keli Cwynar (Cwynar) owns part of a three-unit building in San Francisco as a tenant in common with a married couple, Sam and Susan Blum. Cwynar and the Blums purchased the property on October 21, 1998, at which time all three units were occupied by tenants. The Blums currently reside in one of the units. Cwynar would like to occupy one of the other two units as her principal residence, but she is prohibited by Proposition G from evicting the tenants from either of the other two units. Cwynar is also prohibited from recovering possession of one of the units for her sister to live in, as she had intended to do.

Plaintiff Cliff Cox (Cox) owns part of a six-unit building in San Francisco as a tenant in common with his close friends Bobby and Louise Crotwell. Cox is a retired disabled schoolteacher who suffers from AIDS. Louise Crotwell is a nurse and Bobby Crotwell is a schoolteacher. The Crotwells have two children. Cox and the Crotwells purchased the property in September 1998 with the intention that all of them would live in the same building so that Louise Crotwell could help take care of Cox. Each unit in the building is approximately 750 square feet in size, too small to accommodate the Crotwell family or Cox. Cox and the Crotwells each intended to convert two of the units into one. All of the units are occupied by tenants. Therefore, both Cox and the Crotwells are precluded by Proposition G from residing in the building they own.

Plaintiffs Scott and Caroline Brooks (the Brookses), T-Nga Tran (Tran), Christopher Rankin (Rankin), and Simon Berry (Berry), along with Craig Greenfield, purchased a three-unit building in San Francisco on February 17, 1999, with the intent that all would reside there. Before purchasing the building, each of these plaintiffs was a tenant living in San Francisco. The Brookses moved into a vacant unit. However, since two of the units were occupied at the time the property was purchased, Proposition G precluded these plaintiffs from recovering possession of those two units. Therefore, these plaintiffs exercised their rights under the Ellis Act[5] and initiated proceedings to remove their property from the rental market. However, Tran and Greenfield, and Rankin and Berry could not move·into the two units

necessarily contains some references to that provision because the plaintiffs' theories challenging the two statutes overlapped.

[5]The Ellis Act provides, among other things, that "[n]o public entity . . . shall . . . compel the owner of any residential real property to offer . . . accommodations in the property for rent or lease." (Gov. Code, § 7060, subd. (a).) A property owner who exercises his or her Ellis Act right to not rent property must remove his or her entire property from the rental market. (*Ibid.*)

without first complying with section 209.10, which required them to obtain a conditional use permit. Thus, these plaintiffs could not live in their property or rent the units to tenants.

Plaintiff Mike Howard (Howard) owns a six-unit building in San Francisco. Howard would like to move his 85-year-old mother-in-law into the ground floor unit of that building which is located approximately one-half block away from his home. However, Howard is precluded by Proposition G from evicting tenants from any of the units in the building he owns so his mother-in-law can move in.

Plaintiff Ed Corvi (Corvi), a San Francisco resident, owns a six-unit building in San Francisco. One of the units is occupied by two of Corvi's sons. One of these sons is engaged to be married and wishes to live in another unit with his new wife. However, Proposition G prohibits Corvi from evicting tenants from any of the other units for this purpose.

Plaintiff Richard Worner (Worner) owns a three-unit building in San Francisco. Worner, a San Francisco resident, purchased the building in 1974 and has lived there in the past but does not reside in the building at this time. Worner would like his adult son to move into the basement unit of this building but is prohibited by Proposition G from evicting the tenant in that unit.

Plaintiff Yasin Salma (Salma), a San Francisco resident for 37 years, purchased a six-unit building in San Francisco in June 1998 with the intention that his four children could each move into their own units. For example, one of Salma's daughters who just graduated from college would like to move into a unit that is occupied by a tenant who Salma believes is 60 years of age or older and is the beneficiary of multiple trusts including one worth hundreds of thousands of dollars. Proposition G prohibits Salma from evicting any tenant so that any of his children can move into the building.

Plaintiff Greater Association of San Francisco Realtors is an association of licensed real estate brokers and agents who depend for their livelihood upon the sale and management of real property in San Francisco. Plaintiff San Francisco Apartment Association is an association of 2,600 persons and entities who own residential apartment buildings in San Francisco. Plaintiff Coalition for Better Housing is a nonprofit trade organization of real property owners representing over 10,000 residential units in San Francisco.

## 2. *Claims pertaining to Proposition G*

The first four causes of action in the complaint pertain to Proposition G. Plaintiffs allege that Proposition G is unconstitutional both on its face and as

applied to them. They seek a writ of mandate, prohibition, certiorari or other appropriate relief (first cause of action), declaratory relief (second cause of action), injunctive relief (third cause of action), and damages for inverse condemnation (fourth cause of action).

In their complaint, plaintiffs allege that Proposition G violates numerous distinct provisions of the federal and state Constitutions. They allege that the Proposition constitutes a taking of their private property for public use without just compensation, that it violates their fundamental right to live in property they own, that it violates equal protection, substantive and procedural due process, the right to travel and the right to structure and determine one's family living arrangement. They also allege that Proposition G illegally subjects them to civil and criminal liability for exercising their constitutional rights and that it is unconstitutionally vague. Plaintiffs further allege that Proposition G unconstitutionally impairs the obligations of contracts and violates their right to privacy.

In the fourth cause of action for inverse condemnation, plaintiffs allege two distinct theories in support of their takings claim. First, they allege that "Proposition G forces plaintiffs to suffer a physical invasion and occupation of their unique real property against their wishes and therefore constitutes a taking of plaintiffs' private property for public use without just compensation." Second, plaintiffs allege they have suffered a "regulatory taking of their private property" because they have been deprived "of essential attributes of ownership of their private property including the right to possess and occupy it and to exclude others from it." The complaint alleges that Proposition G compels the plaintiffs "to rent their property to others when they desire for themselves or their family to principally reside in it."

### C. Proceedings in the Lower Court

On May 28, 1999, the City filed a notice of demurrer and demurrer to the complaint. The City argued that each cause of action failed to state facts sufficient to constitute a cause of action. In an order filed July 27, 1999, the lower court sustained the City's demurrer to the first four causes of action without leave to amend. The court's order states: "the Court finds that on all bases alleged, Plaintiffs cannot state causes of action attacking the constitutional validity of . . . Proposition G . . . ."

The court also rejected plaintiffs' contention that section 209.10 was unconstitutional. However, the court ultimately prohibited the City from enforcing section 209.10 based on its findings that the provision was preempted by the Ellis Act and that it was an illegal amendment to Proposition G.

On January 6, 2000, the court entered judgment granting a peremptory writ of mandate prohibiting the City from enforcing section 209.10 and dismissing plaintiffs' remaining causes of action. Plaintiffs appealed from the portion of the judgment sustaining the City's demurrer without leave to amend to the first four causes of action pertaining to Proposition G.

## III. DISCUSSION

### A. Standard of Review and Issue on Appeal

When a judgment is based on an order sustaining a demurrer without leave to amend, the appellant can establish error by showing either that the demurrer was erroneously sustained or that sustaining the demurrer without leave to amend was an abuse of discretion. (*Smith v. County of Kern* (1993) 20 Cal.App.4th 1826, 1829-1830 [25 Cal.Rptr.2d 716].) Sustaining a demurrer constitutes error if the complaint contains allegations that state a cause of action under any legal theory. (*Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 908 [274 Cal.Rptr. 186].) Sustaining a demurrer without leave to amend is "unwarranted, and ordinarily constitutes an abuse of discretion, if there is a reasonable possibility that the defect can be cured by amendment." (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 943, p. 400.)

In reviewing an order sustaining a demurrer we " 'assume the truth of all properly pleaded material allegations of the complaint [citations] and give it a reasonable interpretation by reading it as a whole and its parts in their context. [Citation.]' " (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1381 [272 Cal.Rptr. 387].) We " 'must accept as true not only all facts alleged in the complaint . . . but also " 'facts that may be implied or inferred from those expressly alleged.' " ' [Citation.]" (*Smith v. County of Kern, supra,* 20 Cal.App.4th at p. 1830.)

In the present case, plaintiffs contend that Proposition G violates numerous provisions of the state and federal Constitutions. However, they have not set forth their distinct constitutional claims in separate causes of action; instead, each cause of action seeks different forms of relief. Furthermore, the only legal theories articulated in plaintiffs' pleadings pertain to their takings claim.[6] Perhaps for this reason, the parties have focused primarily on that claim.

In ruling on the City's demurrer, the trial court did not address any specific constitutional provision. Rather, the court simply held, without

---

[6]Even with respect to their takings claim, plaintiffs' legal theories are not particularly well developed. Indeed, the City argues that plaintiffs did not actually allege that Proposition G effected a taking under the California Constitution and that their federal takings claim is,

offering any analysis, that plaintiffs cannot prove that Proposition G is unconstitutional under any theory.

Under these circumstances, we will limit our analysis of this case to the question of whether plaintiffs have alleged or can allege a violation of the takings clauses. Because we answer this question in the affirmative, we conclude the demurrer should not have been sustained.

## B. *Taking of Property Without Just Compensation*

██ "[Our] state and federal Constitutions guarantee property owners 'just compensation' when their property is 'taken for public use.' (Cal. Const., art. I, § 19; U.S. Const., 5th Amend.)" (*Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 770 [66 Cal.Rptr.2d 672, 941 P.2d 851] (*Kavanau*).) "The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." (*Agins v. City of Tiburon* (1980) 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106] (*Agins*).) The question "in any case where government action is challenged as violative of the right to just compensation, is whether the uncompensated obligations and restrictions imposed by the governmental action force individual property owners to bear more than a just share of obligations which are rightfully those of society at large." (*Seawall Associates v. City of New York* (1989) 74 N.Y.2d 92 [544 N.Y.2d 542, 542 N.E.2d 1059, 1062] (*Seawall*).)

██ There is no "set formula" applicable to all cases for determining when a regulation goes too far and effects a taking. (*Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 426 [102 S.Ct. 3164, 3171, 73 L.Ed.2d 868] (*Loretto*).) Indeed, the United States Supreme Court has "concluded that the inquiry in any particular case is 'essentially ad hoc' [citation] and 'a question of degree [that] . . . cannot be disposed of by general propositions' [citation]." (*Kavanau, supra*, 16 Cal.4th at p. 774.) However, over the years, rules have emerged to assist courts in evaluating takings claims.

therefore, premature because plaintiffs did not "exhaust their state compensation remedy under the California Constitution."

 Plaintiffs repeatedly allege in their complaint that Proposition G violates the California Constitution, although they do not specifically reference its takings clause. Furthermore, plaintiffs included in their complaint a state law cause of action for inverse condemnation. To the extent a more precise allegation may have been required, the trial court would certainly have abused its discretion by denying plaintiffs the opportunity to cure what could be no more than a technical flaw in their pleadings.

A per se rule can be applied to "two discrete categories of regulatory action" which constitute takings as a matter of law. (*Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015 [112 S.Ct. 2886, 2893, 120 L.Ed.2d 798] (*Lucas*); *Kavanau, supra,* 16 Cal.4th at p. 774.) First, government action that effectuates a permanent physical invasion of property, no matter how slight, constitutes a per se taking. (*Loretto, supra,* 458 U.S. at pp. 421, 426 [102 S.Ct. at pp. 3168, 3171-3172]; *Lucas, supra,* 505 U.S. at p. 1015 [112 S.Ct. at p. 2893]; *Kavanau, supra,* 16 Cal.4th at p. 774.) Second, regulatory action that deprives an owner of "all economically beneficial or productive use of land" effects a taking as a matter of law. (*Lucas, supra,* 505 U.S. at p. 1015 [112 S.Ct. at p. 2893]; *Agins, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141]; *Kavanau, supra,* 16 Cal.4th at p. 774.)

Government conduct that does not fall into a per se category may, nevertheless, constitute a "regulatory taking." Such regulations must be evaluated under the ad hoc analysis courts have traditionally employed. (*Kavanau, supra,* 16 Cal.4th at p. 776; *Yee v. Escondido* (1992) 503 U.S. 519 [112 S.Ct. 1522, 118 L.Ed.2d 153] (*Yee*).) Two basic tests have been developed to assist courts in applying this essentially fact-based analysis. The first test focuses on the government's purpose for enacting the regulation. (*Kavanau, supra,* 16 Cal.4th at p. 776.) Under this formula, "a regulation of property 'effects a taking if [it] does not substantially advance legitimate state interests.' " (*Id.* at pp. 776 & 781, quoting *Agins, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141]; see also *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825, 834 [107 S.Ct. 3141, 3147-3148, 97 L.Ed.2d 677] (*Nollan*); *Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 964 [81 Cal.Rptr.2d 93, 968 P.2d 993] (*Santa Monica Beach*).) The second test focuses on the impact of the regulation on the property owner. Under this test, a variety of factors may be relevant depending on the facts of the case at issue; there is no comprehensive list to be mechanically applied. (*Kavanau, supra,* 16 Cal.4th at p. 776.)

As the United States Supreme Court has recently confirmed, when evaluating a regulatory takings claim, these factors should be considered and applied in light of "the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606 [121 S.Ct. 2448, 2457-2458, 150 L.Ed.2d 592].)

In the present case, plaintiffs allege that Proposition G constitutes both a per se physical taking and a regulatory taking. These are not separate

claims. (*Yee, supra,* 503 U.S. at pp. 534-535 [112 S.Ct. at pp. 1532-1533].) "They are, rather, separate arguments in support of a single claim—that the ordinance effects an unconstitutional taking." (*Id.* at p. 535 [112 S.Ct. at p. 1532].) As we will explain, we believe plaintiffs have alleged or can allege facts sufficient to support both of these arguments.

## C. *Plaintiffs' Per Se Physical Taking Theory*

Plaintiffs contend that Proposition G constitutes a per se physical taking because it effectively grants tenants lifetime tenancies in plaintiffs' buildings by depriving plaintiffs of their rights to both occupy their own property and to exclude others from their property so close family members may occupy it.

The United States Supreme Court first applied a per se rule to find a physical taking in *Loretto, supra,* 458 U.S. 419. The challenged regulation was a New York law that required a landlord to permit installation of cable facilities on his or her rental property. The *Loretto* court found the regulation effectuated a physical taking by applying the rule that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." (*Id.* at p. 426 [102 S.Ct. at p. 3171].)

In the course of its discussion, the *Loretto* court identified two questions that must be answered in the affirmative in order to find a physical taking. First, is the occupation of the property *direct?* Government-authorized conduct outside the property itself may affect its use but does not amount to a physical invasion. (*Loretto, supra,* 458 U.S. at pp. 426-439 [102 S.Ct. at pp. 3170-3178].) Second, is the occupation *permanent?* A law which effects a transitory invasion rather than a permanent one may be a taking but it does not amount to a per se physical taking. (*Ibid.*) As the *Loretto* court explained, "[t]he permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude." (*Id.* at p. 435, fn. 12 [102 S.Ct. at p. 3176].)

In the present case, plaintiffs have alleged that Proposition G's one-owner-occupancy-per-building restriction and family occupancy restriction effectuate government-authorized *direct* physical occupations of property that plaintiffs own and wish to use as a family residence. For example, the one-owner-occupancy-per-building restriction forces plaintiff Cwynar to permit someone else to live in and directly occupy a unit in her building where she would otherwise live. Other plaintiffs are precluded by the family member restriction from removing tenants from units in buildings they own so that close family members can make those units their homes.

The complaint does not expressly state that the government-authorized physical occupation about which plaintiffs complain is *permanent*, although clearly that is plaintiffs' claim. They argue that Proposition G has the effect of granting tenants lifetime tenancies while, at the same time, permanently depriving plaintiffs of their right to occupy substantial portions of their property.

There is authority that an eviction control regulation can satisfy the permanency requirement of a per se physical taking if the regulatory scheme gives the tenant a potentially endless leasehold and also denies the landlord the right to recover possession for personal use. (*Ross v. City of Berkeley* (N.D.Cal. 1987) 655 F.Supp. 820, 836-842 (*Ross*) [physical taking resulted from regulation that precluded owner from taking possession of commercial property after expiration of the tenant's lease for the purposes of owner occupancy]; *Rivera v. R. Cobian Chinea & Co., Inc.* (1st Cir. 1950) 181 F.2d 974, disapproved on other grounds in *Gilbert v. City of Cambridge* (1st Cir. 1991) 932 F.2d 51, 66, fn. 19 [regulation preventing owner from taking possession of commercial property for personal use constituted a taking]; *Seawall, supra*, 542 N.E.2d at p. 1064 ["loss of possessory interests, including the right to exclude, resulting from tenancies coerced by the government would constitute a per se physical taking"].) In such a case, the prohibition on recovery of possession "effectively extinguish[es] the plaintiffs' possessory interest in a permanent manner." (*Ross, supra,* 655 F.Supp. at p. 837.)

We have found no California case which squarely holds that an eviction protection statute which nullifies an owner's right to occupy his own property can constitute a per se physical taking. However, *Bakanauskas v. Urdan* (1988) 206 Cal.App.3d 621 [253 Cal.Rptr. 764], supports such a rule. In that case, Division Three of this court rejected a tenant's effort to resist eviction by a landlord who intended to use the rental unit as a personal residence. The *Bakanauskas* court recognized that, without such a right, "a landlord could be deprived, possibly indefinitely, of his or her own property which he or she desires, for personal reasons, to occupy as a personal residence, while the benefits of the property as a residence could be enjoyed indefinitely by the tenant. Such a result would render the statute unconstitutionally confiscatory." (*Id.* at p. 627.)

The City cites two cases in which courts in other jurisdictions rejected claims that eviction control provisions constituted per se physical takings. (See *Troy Ltd. v. Renna* (3d Cir. 1984) 727 F.2d 287 (*Troy*); *Dawson v. Higgins* (1994) 197 A.D.2d 127 [610 N.Y.S.2d 200] (*Dawson*).) However, the eviction control measures at issue in those cases were significantly more

limited than the Proposition G restrictions in this case. (*Troy, supra,* 727 F.2d at p. 291 [class of tenants protected from eviction upon conversion of unit to condominium limited by age, disability, length of tenancy and income]; *Dawson, supra,* 610 N.Y.S.2d at p. 203 [provision precluding eviction for personal use applied only to units occupied by individuals who had been tenants in building for at least 20 years].) The very different statutory schemes at issue in *Troy* and *Dawson* were found not to effectuate permanent occupations of landlord properties. (*Troy, supra,* 727 F.2d at p. 301; *Dawson, supra,* 610 N.Y.S.2d at pp. 205-206.) However, we do not interpret either case as holding that an eviction control provision could *never* have such an effect.

As noted above, the complaint does not presently contain allegations that the physical occupation of plaintiffs' property authorized by Proposition G is permanent. However, the *Ross* and *Seawall* decisions lead us to conclude that plaintiffs may be able to satisfy the permanency requirement of a per se physical taking if they can show that Proposition G effectuates coerced lifetime tenancies which effectively extinguish plaintiffs' right to occupy substantial portions of their property.

The City maintains that plaintiffs cannot make such a showing because the occupation of plaintiffs' property by tenants is not coerced as a matter of law. We do not share the City's certainty that no such showing can be made.

According to the City, Proposition G does not authorize coerced tenancies because (1) plaintiffs or their predecessors in interest "voluntarily rented their property to the tenants protected by Proposition G," and (2) plaintiffs are free to exercise their rights under the Ellis Act to evict all of their tenants and to move into their own property. However, this argument overlooks the fact that at least some plaintiffs have alleged that they never voluntarily rented the property they now wish to possess. For example, when Cwynar purchased her property she allegedly had both the intent and the right to evict the tenant in the unit she wished to occupy. Proposition G now precludes her from exercising her ownership right to live in that unit. In addition, the City's assumption that the right to withdraw from the rental market precludes plaintiffs from alleging coercion misses the mark. These plaintiffs have alleged that they wish to live in part of the property they own and to rent out another part and that such an arrangement was possible prior to Proposition G. Plaintiffs are now forced to permit someone else to live in a unit they wish to occupy. Since plaintiffs do not have the option to cease renting only the units that were allegedly taken from them, the Ellis Act does not prevent them from alleging a forced occupation of their private property.

The City contends that *Yee, supra*, 503 U.S. at page 522 [112 S.Ct. at page 1526], supports its position that plaintiffs who are landlords by choice, not by force, simply cannot establish a compelled physical occupation of their property. *Yee* involved a takings challenge to a 1988 mobilehome rent control law which required mobilehome park owners to set back rents for mobilehome pads to 1986 levels and prohibited rent increases without approval of the City counsel. (*Id.* at pp. 524-525 [112 S.Ct. at pp. 1526-1527].) The *Yee* court affirmed the sustaining of a demurrer to a complaint, filed by owners of a mobilehome park, on the very narrow ground that plaintiffs failed to allege facts to support their claim that the rent control statute, on its face, constituted a per se physical taking. (*Id.* at p. 528 [112 S.Ct. at pp. 1528-1529].)

The *Yee* plaintiffs' complaint about the 1988 rent control law was that the government had deprived them of the ability to determine who would be their tenants. Existing law effectively precluded the *Yee* plaintiffs from terminating the tenancy of a mobilehome owner when the owner sold his home. According to the *Yee* plaintiffs, the new rent control law was unconstitutional because it deprived them of the only mechanism they had to control the sale of a home located in their park, the ability to threaten to increase the rent for the mobilehome pad. The *Yee* court held that the plaintiffs did not have a "per se right to compensation based on their inability to exclude particular individuals." (*Yee, supra*, 503 U.S. at p. 531 [112 S.Ct. at p. 1530], italics omitted.)

The *Yee* court rejected the contention that the challenged law authorized a physical taking of the plaintiffs' property. A per se physical taking results only from government authorization of a "compelled physical invasion of property." (*Yee, supra*, 503 U.S. at p. 527 [112 S.Ct. at p. 1528].) The challenged law did not expressly compel plaintiffs to allow tenants to occupy their property. Rather, it regulated the use of that property by "regulating the relationship between landlord and tenant." (*Id.* at p. 528 [112 S.Ct. at p. 1529].) The *Yee* plaintiffs attempted to argue that the statutory scheme had the effect of forcing them to continue to rent their property. However, the court declined to address this argument since plaintiffs had not pleaded an as applied challenge to the statutory scheme. (*Ibid.*) Thus, while the *Yee* court acknowledged that the "right to exclude" is " 'one of the most essential sticks in the bundle of rights that are commonly characterized as

property,' " it concluded that right had not been taken from the *Yee* plaintiffs "on the mere face of the Escondido ordinance." (*Ibid.*)[7]

Contrary to the City's contention, *Yee* does not preclude the plaintiffs in the present case from pleading and attempting to prove that Proposition G authorizes a physical taking of their property. *Yee* addressed a narrow issue —*a facial challenge* to a purely economic rent control law. In contrast to *Yee*, the present case involves an *as applied* challenge to a statute that expressly restricts a property owner's right to exclude others and to live in property that he or she owns. Plaintiffs' theory in this case is not that they have a constitutional right to choose their tenants but rather that they have a constitutional right to live in their own property. Their claim is that they have suffered a physical taking with respect to the part of their property that Proposition G precludes them from occupying.

The *Yee* court did not expressly or implicitly overrule the line of authority we have already discussed recognizing that an eviction control ordinance may, under certain circumstances constitute a physical taking. To the contrary, the court acknowledged that a physical taking might be caused by a statute that, on its face or as applied, "compel[s] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." (*Yee, supra,* 503 U.S. at p. 528 [112 S.Ct. at p. 1529].) Thus, plaintiffs in this case are entitled to the opportunity to prove that Proposition G is an unconstitutional taking as applied to them by showing that the challenged ordinance has the effect of compelling them to rent property or to refrain in perpetuity from terminating a tenancy.

The City focuses on the language in *Yee* underscoring the requirement of a government "compelled physical invasion of property." (*Yee, supra,* 503 U.S. at p. 527 [112 S.Ct. at p. 1528].) Indeed, the element of government coercion is crucial. However, *Yee* does not support the proposition that the option of leaving the rental market altogether is a cure-all mechanism for government coercion. The City overlooks the fact that the challenged statute in *Yee* was a purely economic price control. In that context, the fact that the *Yee* plaintiffs voluntarily rented their property necessarily established there was no government-authorized physical occupation. Here by contrast, the plaintiffs' claim is that the challenged statute itself precludes owners from

---

[7]The *Yee* court found that, since the challenged regulation did not on its face authorize a physical taking, the law should be "analyzed by engaging in the 'essentially ad hoc factual inquiries' necessary to determine whether a regulatory taking has occurred. [Citation.]" (*Yee, supra,* 503 U.S. at p. 529 [112 S.Ct. at p. 1529].) The *Yee* court declined to engage in that analysis because the question whether the rent control law constituted a regulatory taking was not properly before it. (*Id.* at p. 533 [112 S.Ct. at pp. 1531-1532].)

living in their own property by compelling them to rent property to someone else against their will. In this context, the fact that the property was voluntarily rented at some time in the past does not preclude the plaintiffs from pleading and proving government coercion.

The City contends that the Ellis Act necessarily counteracts the allegedly coercive aspects of Proposition G. We disagree; this contention is premised on a basic misunderstanding of the government coercion element of a physical takings claim. If a statute authorizes a compelled physical invasion of a landlord's property, it is no answer to say that the landlord can avoid the invasion by ceasing to be a landlord. In this regard, the *Yee* court expressly affirmed the rule first announced in *Loretto* that " 'a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation.' " (*Yee, supra,* 503 U.S. at p. 531 [112 S.Ct. at p. 1530], quoting *Loretto, supra,* 458 U.S. at p. 439, fn. 17 [102 S.Ct. at p. 3178].) As the court explained in *Loretto,* "[t]he right of a property owner to exclude a stranger's physical occupation of his land cannot be so easily manipulated." (*Loretto, supra,* 458 U.S. at p. 439, fn. 17 [102 S.Ct. at p. 3178].) The City argues that this rule applies only to the "initial occupancy" and once the landlord has consented to that physical occupation, the government may force him to tolerate the occupation until he removes his property from the rental market. In our opinion, neither *Yee* nor *Loretto* supports this proposition.

According to the City, "the *Yee* Court rejected petitioners' argument because, unlike *Loretto,* where the Court found a physical taking, the initial occupancy in *Yee* had been at the invitation of the property owner." But the *Yee* court *did not* hold or intimate that government coercion is relevant only if it corresponds to the initial physical occupation of the premises. In fact, as noted above, the court acknowledged that a statute compelling a landlord to refrain in perpetuity from terminating a tenancy might constitute a physical taking. (*Yee, supra,* 503 U.S. at p. 528 [112 S.Ct. at pp. 1528-1529]; see also *FCC v. Florida Power Corp.* (1987) 480 U.S. 245, 251-253 [107 S.Ct. 1107, 1111-1113, 94 L.Ed.2d 282] [rejecting takings challenge to statute regulating amount a utility could charge a cable company to rent space on utility pole but acknowledging potential constitutional problem if regulation was interpreted as compelling utility to enter into, renew or refrain from terminating rental agreements].)

Nor does *Loretto* support the City's contention that the coercion must correspond to the initial occupation. In that case, the court struck down a statute requiring landlords to permit installation of cable equipment on their

property. (*Loretto, supra*, 458 U.S. 419.) But, contrary to the City's contention, the initial attachment of cable equipment to the *Loretto* plaintiff's property was expressly authorized by the *Loretto* plaintiff's predecessor in interest. (*Loretto, supra*, 458 U.S. at p. 421 [102 S.Ct. at p. 3168].) Notwithstanding that fact, the *Loretto* court found the statute effected a physical taking of the *Loretto* plaintiff's property.

Thus, contrary to the City's contention, plaintiffs' status as voluntary landlords does not preclude them from establishing that Proposition G, as applied to them, effects a permanent physical taking of the portions of their property that they are precluded from occupying. The question is not whether the property owner is a landlord by choice. The question is whether the regulation at issue authorizes a compelled permanent physical occupation of the landlord's property. The government must pay compensation when a regulation amounts to a physical taking whether or not the property at issue is owned by an individual who has chosen to be a landlord. (See, e.g., *Loretto, supra*, 458 U.S. at p. 440 [102 S.Ct. at p. 3178].)

We, of course, are not ruling that Proposition G in fact constitutes a physical taking, but only that, at this stage of the proceedings, such a possibility cannot be ruled out. Put another way, we conclude that the plaintiffs may be able to allege that Proposition G, as applied to them, effects a per se physical taking of their property. To do so, they must allege facts establishing not only government-authorized coercion, but also permanent occupation of their rental property. Though alleging such a claim will be difficult, it is not—as the City contends and the trial court ruled—an impossible task.

## D. *Regulatory Takings Theories*

As we have explained, regulatory takings cases consist of ad hoc inquiries. The two general tests we have extracted from this body of case law are interrelated, and are sometimes combined into one two-part test. (See, e.g., *Kavanau, supra*, 16 Cal.4th at p. 776.) We keep them separate here for the sake of clarity and to illustrate that *both* tests support the conclusion that plaintiffs may be able to show that Proposition G constitutes a regulatory taking.

### 1. *The governmental purpose*

A property owner can prove that a regulation of his or her private property constitutes a taking by showing that the regulation does not *substantially advance* a legitimate state interest. (*Agins, supra*, 447 U.S. at p. 260 [100

S.Ct. at p. 2141]; *Kavanau, supra,* 16 Cal.4th at p. 776.) There must be a "sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance." (*Yee, supra,* 503 U.S. at p. 530 [112 S.Ct. at p. 1530].) In the present case, the parties disagree as to how close this nexus must be.

■ The City contends that this "substantially advance" requirement is equivalent to the rational basis standard of review. We disagree. The United States Supreme Court has expressly stated that this standard is not the same as that "applied to due process or equal protection claims. . . . We have required that the regulation 'substantially advance' the 'legitimate state interest' sought to be achieved, [citation] not that 'the State *could rationally have decided*' that the measure adopted might achieve the State's objective.' " (*Nollan, supra,* 483 U.S. at p. 834, fn. 3 [107 S.Ct. at p. 3147].)

There is confusion among the courts as to how to apply the "substantially advance" requirement. Different levels of scrutiny may be appropriate depending on the type of regulation at issue. (*Santa Monica Beach, supra,* 19 Cal.4th at p. 967.) For example, courts have applied a "heightened" level of scrutiny to discretionary governmental determinations requiring owners to dedicate property or pay fees as a condition for an otherwise lawful use of property. (See, e.g., *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 881 [50 Cal.Rptr.2d 242, 911 P.2d 429] (*Ehrlich*).) At the other extreme, generally applicable zoning or price control regulations are sometimes subject to a "more deferential review." (*Santa Monica Beach, supra,* 19 Cal.4th at p. 966.)

■ The City contends it is entitled to deferential review because Proposition G is a generally applicable rent control law. We disagree on both counts. First, Proposition G clearly is not a typical rent control law. It does not regulate rents or any other economic aspect of the landlord-tenant relationship. Rather, Proposition G precludes evictions from property the owner wishes to reclaim for personal use. As such, Proposition G directly implicates property owners' possessory rights. Second, Proposition G is not "generally applicable," as the City contends. For example, it does not apply to rental units in buildings constructed after June 1979, although it apparently does apply to single-family homes built before that date. Furthermore, owners who must comply with the Proposition G restrictions are not subject to identical treatment. For example, a landlord who owns a building by him or herself is assured of a place to live in his or her property. Co-owners do not enjoy that same right. Further, an owner who resides in his or her building can evict a tenant from another unit in order to provide a home for a close family member. Nonresident owners do not enjoy that same right.

In our view, the governmental justification for enacting Proposition G should be closely scrutinized. It is not a straightforward, evenly applied regulation. It directly affects the possessory property rights of an apparently arbitrary category of property owners. The United States Supreme Court has cautioned that a regulation which affects a physical invasion of any degree merits "special" scrutiny. (*Loretto, supra,* 458 U.S. at p. 432 [102 S.Ct. at p. 3174].) Our own Supreme Court agrees that "[t]here is no question that the takings clause is specially protective of property against *physical occupation or invasion* . . . ." (*Ehrlich, supra,* 12 Cal.4th at pp. 875-876.)

In any event, regardless of the degree of deference to which the measure is entitled, this record does not establish that, as a matter of law, Proposition G substantially advances a legitimate government interest. Plaintiffs have not conceded that any such interest is served, and the City submitted no evidence in the lower court to show that the "substantially advance" requirement is satisfied. Indeed, in its memorandum in support of its demurrer, the City took the position that Proposition G "substantially advances a legitimate government interest on its face . . . ." But the City's position was and is based on the mischaracterization of this regulation as rent control. In our view, Proposition G is not an ordinary rent control law; it is not a price or rate regulation. Proposition G restricts an owner's right to use his or her property as a family home.

In its appellate brief, the City identifies three governmental interests: (1) maintaining a "reasonable balance" of owner-occupied and rental housing; (2) preserving "affordable" housing; and (3) avoiding displacement of low-income, elderly and disabled tenants from their homes. We agree that these goals are certainly legitimate. Courts have consistently recognized the state's legitimate interest in providing and preserving affordable housing. (See, e.g., *Leavenworth Properties v. City and County of San Francisco* (1987) 189 Cal.App.3d 986, 992 [234 Cal.Rptr. 598]; *Santa Monica Pines, Ltd. v. Rent Control Board* (1984) 35 Cal.3d 858, 868 [201 Cal.Rptr. 593, 679 P.2d 27], disapproved on other grounds in *City of West Hollywood v. Beverly Towers, Inc.* (1991) 52 Cal.3d 1184, 1191-1192 [278 Cal.Rptr. 375, 805 P.2d 329].) Furthermore, although the City did not present any such evidence to the lower court, we have little doubt it could show that the stock of affordable rental housing in San Francisco has diminished to the prejudice of low-income, elderly, and disabled tenants.

"The question here, however, concerns the means established by the local law purportedly to achieve th[ese] end[s]. In other words, can it be said that imposing the burdens of the [regulation] on the [property owners] *substantially* advances" one of the aims articulated by the City. (*Seawall, supra,* 542 N.E.2d at p. 1068.)

The City has not identified any evidence to support its claim that Proposition G achieves a "reasonable balance" between owner-occupied and rental housing. And plaintiffs argue no such balance is achieved because the regulation does not adequately take into account the property owner's individual need or special circumstance. Plaintiffs allegations (which, of course, we must accept for purposes of this postdemurrer review) also suggest that the one-owner-occupancy-per-building restriction favors wealthier individuals who can afford to purchase a building on their own. Those individuals will always have access to a residential unit of some kind in their building.

As to its second goal, the City argues that, "[b]y preventing landlords from evicting their tenants for owner move-in, Proposition G *ensures* that the apartments of such tenants will remain part of the City's *affordable* rental housing stock." (Italics added.) But, as the City has acknowledged, one consequence of Proposition G is that, in order for more than one owner to live in the residential rental property, the entire property will have to be withdrawn from the rental market. This consequence of Proposition G, which is demonstrated by the pleadings in this case, could conceivably result in a reduction of the City's "rental housing stock."

Nor does this record support the conclusion that, as a matter of law, Proposition G ensures that rental housing will be "affordable." As we have already explained, Proposition G is not a price or rate regulation and thus cannot be routinely approved as "rent control." The complaint's allegations indicate that Proposition G may actually reduce the amount of affordable housing in San Francisco by, among other things, (1) preventing residents with moderate incomes from ever buying rental property in this City because of the financial consequences of the one-owner-occupancy-per-building restriction; (2) precluding property owners from providing housing to their children and other close relatives; and (3) unduly benefiting some high income tenants by granting them perpetual rights to occupy units that owners want to recover for personal use.

The City's third goal offers only a partial justification for Proposition G. On its face, the tenant-protection restriction substantially advances the City's goal of avoiding displacement of elderly and disabled tenants many of whom may have low incomes. However, this and other provisions of Proposition G may also have the effect of displacing elderly, ill, or disabled property owners and/or relatives of property owners who are desperately in need of a home. Furthermore, there is no evidence, nor even an argument advanced by the City, that this goal is advanced by the one-owner-occupancy-per-building restriction or the family occupancy restriction, which plaintiffs also challenge.

At this pleadings stage in the litigation, whether the restrictions imposed by Proposition G substantially advance legitimate state interests is still an open question. Thus, plaintiffs should not have been denied the opportunity to establish a regulatory taking by showing that these restrictions do not, in fact, advance legitimate state interests.[8]

Furthermore, even if the City does ultimately establish that Proposition G substantially advances legitimate state interests, plaintiffs could still show that this regulation constitutes a regulatory taking. In other words, government is not automatically excused from liability under takings clauses simply because it acts in "pursuit of an important public purpose." (*Florida Rock Industries, Inc. v. U.S.* (Fed. Cir. 1994) 18 F.3d 1560, 1571.) "To so hold would eviscerate the plain language of the Takings Clause, and would be inconsistent with Supreme Court guidance. It is necessary that the Government act in a good cause, but it is not sufficient. The takings clause already assumes the Government is acting in the public interest: 'nor shall private property be taken *for public use* without just compensation.' " (*Id.* at p. 1571, fn. omitted.)

### 2. *The balancing test*

The takings clause is intended to preclude "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." (*Armstrong v. United States* (1960) 364 U.S. 40, 49 [80 S.Ct. 1563, 1568, 4 L.Ed.2d 1554].) ▮▮▮ As noted above, several factors may be utilized by the property owner to show that the regulatory burden imposed on him is unconstitutional. (*Kavanau, supra*, 16 Cal.4th at p. 776.)[9]

▮ In the present case, the allegations in the complaint implicate several relevant factors which support plaintiffs' contention that Proposition

---

[8]The complaint does not currently contain allegations that Proposition G fails to substantially advance a legitimate governmental purpose. To the extent such a theory should have been expressly alleged, plaintiffs should have been afforded the opportunity to amend their complaint.

[9]Courts have identified a variety of potentially relevant factors, including: (1) " '[t]he economic impact of the regulation on the claimant' "; (2) " 'the extent to which the regulation has interfered with distinct investment-backed expectations' "; (3) " 'the character of the governmental action' "; (4) "whether the regulation 'interfere[s] with interests that [are] sufficiently bound up with the reasonable expectations of the claimant to constitute "property" for Fifth Amendment purposes' "; (5) "whether the regulation affects the existing or traditional use of the property and thus interferes with the property owner's 'primary expectation' "; (6) " 'the nature of the State's interest in the regulation' [citations] and, particularly, whether the regulation is 'reasonably necessary to the effectuation of a substantial public purpose' "; (7) "whether the property owner's holding is limited to the specific interest the regulation abrogates or is broader"; (8) "whether the government is acquiring

G imposes a disproportionate burden on them by essentially requiring them to forfeit their own homes in order to create public housing.

 When evaluating a regulatory takings claim it is appropriate to consider, among other things, the "character of the governmental action" at issue and the extent to which that action "interferes" with the property owner's "reasonable" and "primary" expectations as to the use of his property. (*Kavanau, supra*, 16 Cal.4th at p. 775.) Plaintiffs have alleged facts sufficient to support their contention that Proposition G substantially interferes with their reasonable and primary ownership expectations. Plaintiffs have alleged that Proposition G "forces plaintiffs to suffer a substantial interference with their rightful use and enjoyment of their properties in conflict with their reasonable expectation that they and/or their close relatives could occupy said properties" Plaintiffs have also alleged that Proposition G has "deprived [them] of essential attributes of ownership of their private property including the right to possess and occupy it and to exclude others from it."

Another factor relevant to this inquiry is whether the regulation provides the property owner any benefits or rights that " 'mitigate whatever financial burdens the law has imposed.' " (*Kavanau, supra*, 16 Cal.4th at p. 775.) Plaintiffs contend they have been provided no such rights or benefits and the City does not dispute this. Plaintiffs also contend that Proposition G lacks any "mitigation" measure, any "property owner hardship provision" and "any procedure for individualized consideration or treatment of a property owner." Although some of the restrictions imposed by the Proposition G amendments to section 37.9 are subject to limited hardship exceptions, plaintiffs validly complain that there is no meaningful mechanism in the regulation for adequately considering or attempting to prevent possible unfair hardship to some property owners.

Furthermore, the burden imposed on all property owners subject to the Proposition G restrictions is clearly significant. "Under the traditional conception of property, the most important of the various rights of an owner is the right of possession which includes the right to exclude others

---

'resources to permit or facilitate uniquely public functions,' such as government's 'entrepreneurial operations' "; (9) "whether the regulation 'permit[s the property owner] . . . to profit [and] . . . to obtain a "reasonable return" on . . . investment' "; (10) "whether the regulation provides the property owner benefits or rights that 'mitigate whatever financial burdens the law has imposed' "; (11) "whether the regulation 'prevent[s] the best use of [the] land' "; (12) "whether the regulation 'extinguish[es] a fundamental attribute of ownership' "; (13) "whether the government is demanding the property as a condition for the granting of a permit." (*Kavanau, supra*, 16 Cal.4th at p. 775.)

from occupying or using the space. [Citation.]" (*Seawall, supra,* 542 N.E.2d at p. 1063.) Property rights in a physical thing include the rights " 'to possess, use and dispose of it.' " (*Loretto, supra,* 458 U.S. at p. 435 [102 S.Ct. at p. 3176].) ▮ Plaintiffs have alleged that Proposition G has seriously abridged if not destroyed these important property rights.

The City offers us three grounds upon which, it contends, we can sustain the trial court's conclusion that plaintiffs cannot establish a regulatory taking as a matter of law. First, the City argues that government conduct resulting in the abridgement of a possessory ownership right does not offend the takings clause unless the abridgment is so complete that it effectuates a per se physical taking. But the governing authority is to the contrary. " '[W]hether the regulation 'extinguish[es] a fundamental attribute of ownership' " is clearly a relevant factor in a regulatory takings analysis. (*Kavanau, supra,* 16 Cal.4th at p. 775.) While a permanent physical invasion is always a taking, a physical invasion short of that must be evaluated under the ad hoc approach. (*Loretto, supra,* 458 U.S. at p. 432 [102 S.Ct. at p. 3174].)

Second, the City argues that plaintiffs cannot establish that Proposition G is a regulatory taking because plaintiffs have not been denied all economically viable use of their property. But a regulation may effect a taking even though it *"leaves the property owner some economically beneficial use of his property."* (*Kavanau,* 16 Cal.4th at p. 774, citing *Lucas, supra,* 505 U.S. at p. 1019, fn. 8 [112 S.Ct. at p. 2895].) Such an owner simply loses the benefit of the per se analysis. (*Kavanau, supra,* at p. 774, quoting *Lucas, supra,* at p. 1019, fn. 8.) Indeed, the United States Supreme Court acknowledged this fact in its recent decision in *Palazzolo v. Rhode Island, supra,* 533 U.S. at p. __ [121 S.Ct. at p. 2457].)

Many of the factors courts have traditionally used to evaluate regulatory takings claims focus on the economic impact of the regulation on the property owner. (See *ante,* fn. 9.) And the complaint in this case contains allegations that Proposition G imposes unfair economic hardships on certain property owners. The fact that Proposition G does not cause a complete economic property loss does not preclude these plaintiffs from establishing a regulatory taking. Indeed, "there are plainly a number of non-economic interests in land whose impairment will invite exceedingly close scrutiny under the Takings Clause." (*Lucas, supra,* 505 U.S. at p. 1019, fn. 8 [112 S.Ct. at p. 2895].)

Third, the City contends that Proposition G cannot constitute a regulatory taking because it preserves the historic use of plaintiffs' properties as

residential rental properties. Whether a regulation "affects the existing or traditional use of the property and thus interferes with the property owner's 'primary expectation' " is a relevant factor when evaluating a regulatory takings claim. (*Kavanau, supra,* 16 Cal.4th at p. 775.) However, in this case plaintiffs have alleged that Proposition G has fundamentally changed and substantially restricted plaintiffs' use of their residential rental property by precluding them from residing in property they own and by preventing them from making that property available to close family members who wish to live in it. Whether and how much Proposition G has altered the historical use of plaintiffs' property are disputed issues of fact requiring further development in the trial court.

In our view, all three of the City's arguments are premised on a fundamental misunderstanding of a regulatory takings analysis. Our state and federal Supreme Courts have both unequivocally advocated the ad hoc, factor-based approach for analyzing regulatory takings claims. (*Yee, supra,* 503 U.S. at p. 529 [112 S.Ct. at p. 1529]; *Lucas, supra,* 505 U.S. at p. 1019, fn. 8 [112 S.Ct. at p. 2895]; *Kavanau, supra,* 16 Cal.4th at p. 775.) The City attempts to resist plaintiffs' regulatory takings claim by advancing per se rules that are simply inconsistent with the ad hoc analysis that applies to regulatory takings claims.

### 3. *The trial court's role*

In sustaining the City's demurrer without leave to amend, the trial court did not undertake any substantive analysis regarding the unusual regulation at issue in this case and its impact on these plaintiffs. As we have explained, regulatory takings claims are subject to essentially ad hoc, factual inquiries. "But recourse to the facts hardly solves the basic problem at hand—there simply is no bright line dividing compensable from noncompensable exercises of the Government's power when a regulatory imposition causes a partial loss to the property owner. What is necessary is a classic exercise of judicial balancing of competing values." (*Florida Rock Industries, Inc. v. U.S., supra,* 18 F.3d at p. 1570.) "An individualized assessment of the impact of the regulation on a particular parcel of property and its relation to a legitimate state interest is necessary in determining whether a regulatory restriction on property use constitutes a compensable taking." (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 10 [32 Cal.Rptr.2d 244, 876 P.2d 1043].)

It simply is not our role to engage, in the first instance, in the individualized assessment that the regulatory takings analysis requires. We have

neither the record nor the resources to engage in a meaningful exercise of judicial balancing of the competing values at issue. Indeed, that is a task for the trial court. Our task is simply to determine whether plaintiffs have properly alleged that Proposition G constitutes a regulatory taking. We conclude they have and, therefore, that the City's demurrer to the causes of action pertaining to Proposition G should not have been sustained.

### E. *Conclusion*

To summarize, the judgment must be reversed to the extent that it disposed of plaintiffs' causes of action challenging the constitutionality of Proposition G. Plaintiffs' allegations support their claim that Proposition G constitutes a regulatory taking. Furthermore, plaintiffs are entitled to the opportunity to amend their complaint to attempt to adequately allege that Proposition G effects a per se physical taking. Finally, since our conclusion that plaintiffs have alleged that Proposition G violates the takings clauses requires reversal, we need not address plaintiffs' arguments that Proposition G violates other constitutional provisions as well.

### IV. DISPOSITION

The part of the judgment dismissing plaintiffs' first four causes of action is reversed and this case is remanded to the trial court for further proceedings consistent with this opinion. Plaintiffs are awarded their costs on appeal.

Kline, P. J., and Lambden, J., concurred.

The petition of appellant City and County of San Francisco for review by the Supreme Court was denied September 26, 2001.