[No. B146227. Second Dist., Div. One. Dec. 13, 2001.]

ACTION APARTMENT ASSOCIATION et al., Plaintiffs and Appellants,
v.
SANTA MONICA RENT CONTROL BOARD, Defendant and
Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts E and F in the Discussion.

588

**COUNSEL**

Law Offices of Rosario Perry, Rosario Perry and Marie E. Berglund for Plaintiffs and Appellants.

Doris M. Ganga and Joel Martin Levy for Defendant and Respondent.

## OPINION

MALLANO, J.—The City of Santa Monica requires landlords of residential rental property to place tenants' security deposits in interest-bearing accounts at federally insured financial institutions. Since January 1, 1999, the city has required landlords to pay tenants 3 percent interest per year on security deposits.

A group of landlords filed this action, alleging that, due to market conditions, financial institutions are paying less than 3 percent on security deposits, and, as a result, landlords must make up the difference with their own funds. The landlords contend that this type of exaction constitutes a taking of private property without just compensation (Cal. Const., art. I, § 19; U.S. Const., 5th Amend.).

The trial court dismissed the action on demurrer. We conclude that the complaint sufficiently pleads a takings claim because the 3 percent interest requirement does not substantially advance a legitimate state interest and has an adverse impact on landlords. We therefore reverse.

## I

## BACKGROUND

In 1979, the City of Santa Monica adopted a rent control charter amendment—the Rent Control Law (Santa Monica Charter, §§ 1800-1820)—and created a rent control board (Board) to prevent landlords of residential rental property from charging unreasonably high rents while, at the same time, allowing landlords to make a fair return on their property. Pursuant to the Rent Control Law, the Board adopted regulations that use a "net operating income" (NOI) formula to determine whether rents are providing landlords with a fair return on their property and, if not, the amount of a rent adjustment.

Under the NOI formula, a landlord's income in the base year (usually 1978) is presumptively a fair return. (Santa Monica Rent Bd. Regs., reg. Nos. 4101(e), 4102.) In subsequent years, a fair return is maintained by permitting rents to be raised based on increased operating expenses and inflation. "NOI" is defined as "gross income" less "operating expenses." (*Id.*, reg. No. 4101(a).) "Gross income" includes gross rents (computed as gross rental income at 100 percent paid occupancy), cleaning fees, parking fees, and income from laundry facilities. (*Id.*, reg. No. 4101(b).) "Operating expenses" include real property taxes, utility costs, insurance expenses,

management fees, normal repair and maintenance expenses, and expenditures for capital improvements. (*Id.*, reg. No. 4101(c)(1); see generally *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 768-770 [66 Cal.Rptr.2d 672, 941 P.2d 851] (*Kavanau*).)

As amended, the Rent Control Law states: "Any payment or deposit of money the primary function of which is to secure the performance of a rental agreement or any part of such agreement, including an advance payment of rent, shall be placed in an interest bearing account at a federally insured financial institution until such time as it is returned to the tenant or entitled to be used by the landlord. Unless and until the Board enacts regulations directing that the interest on such accounts *be paid directly to the tenant*, the landlord may either pay such interest directly to the tenant *or use it to offset operating expenses* . . . . The Board may regulate the amount and use of security deposits consistent with the purposes of this Article and State law." (Santa Monica Charter, § 1803(s), italics added.)

The Board amended its regulations in 1983 to state that "[a]ll security deposits shall be placed in an interest-bearing account at an institution whose accounts are insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation until such time as they are returned to tenants or entitled to be used by the landlord." (Santa Monica Rent Bd. Regs., reg. No. 14001(a).) The amended regulations did not require that tenants receive the interest on security deposits. Accordingly, landlords could either pay the interest to tenants or use it to benefit the property. (Santa Monica Charter, § 1803(s); see Rent Bd. Regs., former reg. No. 14001(b).) Until recently, that was the state of affairs in Santa Monica.

On January 28, 1999, the Board approved regulations stating: "A landlord shall pay 3% simple interest per annum on all security deposits held for [at] least one year. The Rent Control Board shall review the market interest rates at least every three years to determine the rate for the next three years. [¶] . . . Interest shall begin accruing on January 1, 1999. A tenant shall be given unpaid accrued interest either by direct payment or by a credit against the tenant's rent." (Santa Monica Rent Bd. Regs., reg. No. 14001(b), (c).)

With the enactment of the 1999 regulations, the Board exercised its authority under the Rent Control Law to "direct[] that the interest on [security deposit] accounts be paid directly to the tenant . . . ." (Santa Monica Charter, § 1803(s).) As a consequence, landlords could no longer use the interest to benefit the property. Instead, they became obligated to *pay* tenants a *fixed* rate of return—3 percent per year—on security deposits. (The

Rent Control Law requires that security deposits be placed in a "federally insured financial institution." For simplicity, we will use the term "bank" to include all such institutions.)

On March 28, 2000, Action Apartment Association, an organization of residential landlords, and Herb Balter, a landlord who owns 18 rental units, filed this class action, seeking declaratory and injunctive relief and damages for inverse condemnation. (We sometimes refer to the association and Mr. Balter collectively as plaintiffs or the Association.)

The complaint alleged as follows: "[A]ll members of the Plaintiffs' class pay their tenants interest on security deposits at a rate more than the amount of interest paid by the banks on the deposited funds. . . . [¶] . . . [¶]

"At the time [that] the first interest payment to tenants was due . . . , landlords were receiving between .5% and 1.5% per year on their security deposited funds. This means that at least half of the payment of 3% by landlords was not and is not offset by [the] receipt of interest from the bank and . . . amounts to confiscation by regulation of the landlords' own funds. [¶] . . . [¶]

"[T]here are approximately 3,200 owners of residential rental property [in Santa Monica] and approximately 28,000 residential rental units. This means that [the regulations concerning interest on security deposits] have caused or will cause the residential rental landlords of Santa Monica to pay approximately $770,000.00 per year which they should not have had to pay. [¶] . . . [¶]

"[The Board] will not review the 3% interest rate set by the regulations for 3 more years. Thus before the next scheduled review, landlords will lose in excess of $2,000,000.00 due to the wrongful regulations. [¶] The lost interest payments are not offset by any corresponding general rental increase or any other payment of monies to landlords. [¶] . . . [¶]

"The difference between the interest received and the interest paid out has caused and will cause Plaintiffs . . . to have out-of-pocket losses . . . ."

The complaint alleged that the regulations concerning security deposit interest were: (1) invalid under the takings clauses of the state and federal Constitutions (Cal. Const., art. I, § 19; U.S. Const., 5th Amend.); (2) pre-empted by a state statute that governs the payment, use, and return of security deposits (Civ. Code, § 1950.5); and (3) unlawful as being in excess of the Board's authority under the Rent Control Law (Santa Monica Charter, § 1803(s)).

On July 17, 2000, the Association filed an amended complaint that, in most respects, was identical to the first one. The Association added an allegation that it "[did] not challenge the maintenance of security deposits or the payment of interest on security deposits; [the Association] challenge[s] only the mandated payment in excess of interest earned on the deposited funds with its effect of requiring landlords to reach into their own pockets to pay the additional interest." The Association also added a cause of action seeking a writ of prohibition.

On August 23, 2000, the Board filed a demurrer, arguing that the Association's legal theories were without merit. The Association filed opposition. On September 28, 2000, the matter was heard and taken under submission. On October 25, 2000, the trial court issued its ruling, sustaining the demurrer without leave to amend. An order and judgment were entered to that effect. The Association filed a timely appeal.

## II

### DISCUSSION

In reviewing the ruling on a demurrer, "we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . . We also consider matters which may be judicially noticed.' . . . When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. . . . And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58], citations omitted.) All material allegations of the complaint are accepted as true. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 8, fn. 3 [32 Cal.Rptr.2d 244, 876 P.2d 1043].)

We begin our analysis by discussing the characteristics of rent and security deposits under the Rent Control Law. We then apply takings principles to the allegations of the amended complaint. Next, we consider the Board's arguments that a viable takings claim has not been pleaded. Finally, in the unpublished portion of the opinion, we discuss whether the Board's regulations are preempted by state law and whether they exceed the Board's authority under the Rent Control Law.

### A. *Rent*

" 'Rent' is the consideration paid by the tenant to the landlord 'for the use, enjoyment and possession of the leased premises.' " (*Smith v. State Bd. of*

*Equalization* (1997) 53 Cal.App.4th 331, 336, fn. 5 [61 Cal.Rptr.2d 604].) It is the means by which landlords make a profit on their property. Rent is paid throughout the tenancy, usually once a month, in advance. (Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2000) ¶¶ 2:146 to 2:148, pp. 2B-30 to 2B-30.2.) As a general rule, "[a] lease must include a definite description of the property leased and an agreement for rent[] to be paid at particular times during a specified term." (*Beckett v. City of Paris Dry Goods Co.* (1939) 14 Cal.2d 633, 637 [96 P.2d 122].)

Under the Rent Control Law, the Board must adjust rents under the NOI formula to provide landlords with a fair return on their property. (See Santa Monica Charter, §§ 1800, 1805(e); Santa Monica Rent Bd. Regs., reg. No. 4100.) The Board implements a "general adjustment" each year by holding public hearings and, thereafter, "adjust[ing] upward or downward the rent ceiling for *all* controlled rental units in general and/or for *particular categories* of controlled rental units deemed appropriate by the Board." (Santa Monica Charter, § 1805(a), italics added; see Rent Bd. Regs., reg. Nos. 3201-3303.) The Board generally adjusts rents upward to reflect any increases in taxes, utility bills, or the cost of maintenance. (Santa Monica Charter, § 1805(b).) A downward adjustment is warranted only if taxes have decreased. (*Ibid.*)

If a landlord is not satisfied with the general adjustment, it can file a petition for an individual rent adjustment, that is, an increase in rents. (See Santa Monica Charter, § 1805(c), (d); Santa Monica Rent Bd. Regs., reg. Nos. 4001-4005, 4108(a).) A hearing examiner will conduct a public hearing on the petition and render a written decision in accordance with the NOI formula. A landlord, tenant, or Board member can appeal the hearing examiner's decision to the Board, which will conduct a public hearing and issue a written decision. (Santa Monica Charter, § 1805(c), (d); Rent Bd. Regs., reg. Nos. 4007-4029.)

"In making [both] individual *and* general adjustments . . . [t]he Board may adopt as its fair return standard any lawful formula, including but not limited to one based on investment or [NOI]. The Board shall consider all factors relevant to the formula it employs; such factors may include: increases or decreases in operating and maintenance expenses, the extent of utilities paid by the landlord, necessary and reasonable capital improvement of the controlled rental unit as distinguished from normal repair, replacement and maintenance, increases or decreases in living space, furniture, furnishings, equipment, or services, substantial deterioration of the controlled rental

unit other than as a result of ordinary wear and tear, failure on the part of the landlord to provide adequate housing services or to comply substantially with applicable housing, health and safety codes, federal and state income tax benefits, the speculative nature of the investment, whether or not the property was acquired or is held as a long term or short term investment, the landlord's rate of return on investment, the landlord's current and base date [NOI], and any other factor deemed relevant by the Board in providing the landlord a fair return." (Santa Monica Charter, § 1805(e), italics added; see *id.*, § 1805(f)-(h); Santa Monica Rent Bd. Regs., reg. Nos. 4100-4112.)

## B. *Security Deposit*

Unlike rent, which belongs to the landlord, a security deposit is the property of the tenant. (See Civ. Code, § 1950.5, subds. (d)-(f); *Korens v. R.W. Zukin Corp.* (1989) 212 Cal.App.3d 1054, 1058-1059 [261 Cal.Rptr. 137]; Comment, *Interest on Security Deposits—Benefit or Burden to the Tenant?* (1978) 26 UCLA L.Rev. 396, 403 & fn. 45, citing former Civ. Code, § 1950.5, subd. (b), added by Stats. 1972, ch. 618, § 4, p. 1096, now Civ. Code, § 1950.5, subd. (d).)

Rent provides the landlord with a profit. (Santa Monica Charter, §§ 1800, 1805(e); Santa Monica Rent Bd. Regs., reg. No. 4100.) Interest on a security deposit provides the tenant with a profit. (Rent Bd. Regs., reg. No. 14001(b).) Creditors of a landlord cannot reach security deposits (see Civ. Code, § 1950.5, subd. (d)), but they can seize rental proceeds (*Federal National Mortgage Assn. v. Bugna* (1997) 57 Cal.App.4th 529 [67 Cal.Rptr.2d 233]).[1]

While rent adjustments provide landlords with a fair return on their property, a security deposit—from the landlords' perspective—serves a different purpose: to protect and preserve their property and investment. " 'Security deposits' may be a landlord's best guarantee against risks of rent nonpayment and damage to the premises." (Friedman et al., Cal. Practice Guide: Landlord-Tenant, *supra*, ¶ 2:158, p. 2B-30.7 (rev. #1 1999).)

---

[1] The Rent Control Law defines "rent" as "[a]ll periodic payments and all nonmonetary consideration including but not limited to, the fair market value of goods or services rendered to or for the benefit of the landlord under an agreement concerning the use or occupancy of a rental unit and premises including all payment and consideration demanded or paid for parking, pets, furniture, subletting and *security deposits for damages and cleaning.*" (Santa Monica Charter, § 1801(f), italics added.) To the extent a security deposit is used to compensate a landlord for damages and cleaning, it becomes the property of the landlord. (Civ. Code, § 1950.5, subds. (b), (e).) Otherwise, the security deposit belongs to the tenant. (See Civ. Code, § 1950.5, subds. (d)-(f); *Korens v. R.W. Zukin Corp., supra*, 212 Cal.App.3d at pp. 1058-1059; Comment, *Interest on Security Deposits—Benefit or Burden to the Tenant?*, *supra*, 26 UCLA L.Rev. at p. 403 & fn. 45.)

Landlords may use a security deposit in several ways, including: "(1) The compensation of a landlord for a tenant's default in the payment of rent. [¶] (2) The repair of damages to the premises, exclusive of ordinary wear and tear, caused by the tenant or by a guest or licensee of the tenant. [¶] (3) The cleaning of the premises upon termination of the tenancy. [¶] (4) To remedy future defaults by the tenant in any obligation under the rental agreement to restore, replace, or return personal property or appurtenances, exclusive of ordinary wear and tear, if the security deposit is authorized to be applied thereto by the rental agreement." (Civ. Code, § 1950.5, subd. (b)(1)-(4); see *id.*, subd. (e).)

The maximum amount of a security deposit is determined by the amount of the first rent payment; the deposit cannot exceed two months' rent for an unfurnished unit or three months' rent for a furnished unit. (Civ. Code, § 1950.5, subd. (c); Santa Monica Rent Bd. Regs., reg. No. 14002(b).) In general, rents increase over time. In contrast, a security deposit is usually paid once and does not increase. (Civ. Code, § 1950.5, subd. (c); Rent Bd. Regs., reg. No. 14002(c).) Thus, even though the first rent payment determines the ceiling on security deposits, rents will increase over time (as will the cost of most goods and services), but the security deposit generally will not change.[2] With each passing year, the security deposit provides less protection for the landlord's property and investment.

■ As one leading treatise has explained: "All security deposits received by a landlord are held for the benefit of his tenants, and subject to total or partial refund, and a tenant's claim for refund has priority over the claims of the landlord's creditors. The deposits are subject to refund to the tenant at the termination of the tenancy, after lawful deductions; there are no 'nonrefundable' or 'forfeitable' security deposits, and the right of the tenant to receive a refund cannot be altered or modified by any agreement between the parties." (6 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 18:78, p. 183, fns. omitted; see Civ. Code, § 1950.5.)

As stated, the NOI formula is used to adjust rents. With respect to interest on security deposits, neither the Rent Control Law nor the regulations provide a formula for setting the interest rate.

---

[2]With regard to tenancies commencing before January 1, 1999, the Board has recognized that, in limited situations, a landlord can increase a security deposit during tenancy: "[A] landlord may collect an additional security deposit of up to 1 (one) month's additional rent with the written consent of the tenant(s) giving the deposit where the landlord agrees in return to permit the tenant(s) to have additional tenants or to have pets or to make some similar use of the apartment which use was not permitted as of April 10, 1978 or other date on which the base rent was established for the unit." (Santa Monica Rent Bd. Regs., reg. No. 14003(a).) If the tenant subsequently terminates the new use permitted by the increased security deposit, the landlord must refund the additional payment. (*Id.*, reg. No. 14003(b).)

C. *Takings Law*

Our state Constitution provides that "[p]rivate property may be taken or damaged for public use only when just compensation . . . has first been paid to, or into the court for, the owner." (Cal. Const., art. I, § 19.) The federal Constitution states: "[N]or shall private property be taken for public use, without just compensation." (U.S. Const., 5th Amend; see *Chicago, Burlington &c. R'd v. Chicago* (1897) 166 U.S. 226, 239 [17 S.Ct. 581, 585-586, 41 L.Ed. 979] [federal takings clause applies to the states].)

As a preliminary matter, we point out that most regulatory takings cases involve a regulated or affected business (a landlord) contending that the applicable regulation (rent control) does not allow it to make a sufficient profit. This case does not fall into that category. The issue here is not whether landlords in Santa Monica make a fair return on their property.

Rather, we start with the recognition that two distinct groups make a profit under the Rent Control Law and the Board's regulations: (1) landlords, by collecting rents; and (2) tenants, by earning 3 percent interest on security deposits. The present case involves the *tenants'* profit, and, more specifically, whether the interest forcibly paid by landlords is too high. Traditional takings principles did not develop with this scenario in mind. Even so, we find that current takings jurisprudence provides an adequate framework for analyzing the issue before us.

▇▇▇ The Association challenges the obligation to pay *3 percent* interest on security deposits, as decreed by the Board, while the interest paid by banks is lower, alleged to be *.5 to 1.5 percent.* Concededly, the Board has the authority to require that tenants receive the amount of interest paid by the banks.

▇▇▇ "The Takings Clause . . . preserves governmental power to regulate, subject only to the dictates of ' "justice and fairness." ' . . . There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. . . . Resolution of each case, however, ultimately calls as much for the exercise of judgment as for the application of logic." (*Andrus v. Allard* (1979) 444 U.S. 51, 65 [100 S.Ct. 318, 327, 62 L.Ed.2d 210], citations omitted.) "The concepts of 'fairness and justice' . . . underlie the Takings Clause . . . ." (*Palazzolo v. Rhode Island* (2001) [533 U.S. 606, 121 S.Ct. 2448, 2466, 150 L.Ed.2d 592] (conc. opn. of O'Connor, J.) (*Palazzolo*); accord, *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.* (1993) 508 U.S. 602, 646-647 [113 S.Ct. 2264, 2291-2292, 124 L.Ed.2d 539].)

"[T]he United States Supreme Court [has held] that a regulation of property that 'goes too far' may effect a taking of that property, though its title remains in private hands." (*Kavanau, supra,* 16 Cal.4th at p. 773.) "[T]he Court [has] recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs. In Justice Holmes' well-known, if less than self-defining, formulation, 'while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking.'" (*Palazzolo, supra,* 533 U.S. at p. 617 [121 S.Ct. at p. 2457].) The United States Supreme Court "has concluded that the inquiry in any particular case is 'essentially ad hoc' . . . and 'a question of degree [that] . . . cannot be disposed of by general propositions' . . . ." (*Kavanau, supra,* 16 Cal.4th at p. 774, citations omitted.)

Nevertheless, "[a] per se rule can be applied to 'two discrete categories of regulatory action' which constitute takings as a matter of law. . . . First, government action that effectuates a permanent physical invasion of property, no matter how slight, constitutes a per se taking. . . . Second, regulatory action that deprives an owner of 'all economically beneficial or productive use of land' effects a taking as a matter of law." (*Cwynar v. City and County of San Francisco* (2001) 90 Cal.App.4th 637, 652 [109 Cal.Rptr.2d 233] (*Cwynar*), citations omitted; accord, *Kavanau, supra,* 16 Cal.4th at pp. 773-774.)

"Government conduct that does not fall into a per se category may, [however,] constitute a 'regulatory taking.' Such regulations must be evaluated under the ad hoc analysis courts have . . . employed. . . . Two basic tests have been developed to assist courts in applying this essentially fact-based analysis. The first test focuses on the government's purpose for enacting the regulation. . . . Under this formula, 'a regulation of property "effects a taking if [it] does not substantially advance legitimate state interests."' . . . The second test focuses on the impact of the regulation on the property owner. Under this test, a variety of factors may be relevant depending on the facts of the case at issue; there is no comprehensive list to be mechanically applied. . . . [¶] . . . [¶] . . . The two general tests . . . are interrelated, and are sometimes combined into one 2-part test." (*Cwynar, supra,* 90 Cal.App.4th at pp. 652-659, citations omitted; accord, *Kavanau, supra,* 16 Cal.4th at pp. 774-776, 780-781.) Here, we apply both parts of the test.

## 1. *Governmental Purpose*

"A property owner can prove that a regulation of his or her private property constitutes a taking by showing that the regulation does not substantially advance a legitimate state interest. . . . There must be a 'sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance.' . . .

". . . The United States Supreme Court has expressly stated that this standard is not the same as that 'applied to due process or equal protection claims. . . . [The court has] required that the regulation "substantially advance" the "legitimate state interest" sought to be achieved, . . . not that "the State 'could rationally have decided' that the measure adopted might achieve the State's objective." ' . . .

"[Some] courts have applied a 'heightened' level of scrutiny to discretionary governmental determinations requiring owners to dedicate property or pay fees as a condition for an otherwise lawful use of property. . . . At the other extreme, generally applicable zoning or price control regulations are sometimes subject to a 'more deferential review.' " (*Cwynar, supra*, 90 Cal.App.4th at pp. 659-660, citations and italics omitted; see *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 859-860, 866-881 [50 Cal.Rptr.2d 242, 911 P.2d 429] (plur. opn. of Arabian, J.) [discussing levels of scrutiny in takings cases]; *id.* at pp. 888-901 (conc. opn. of Mosk, J.) [same]; *id.* at pp. 903, 907 (conc. & dis. opn. of Kennard, J.) [same].)

In *Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952 [81 Cal.Rptr.2d 93, 968 P.2d 993] (*Santa Monica Beach*), a landlord challenged the Rent Control Law under the takings clause, alleging that the law did not substantially advance a legitimate state interest. (*Id.* at p. 964.) The court, in a four-to-three decision, rejected that challenge, stating: "[T]he heightened intermediate scrutiny standard . . . does not apply in this case. Rather, the standard of review for generally applicable rent control laws must be at least as deferential as for generally applicable zoning laws and other legislative land use controls." (*Id.* at p. 967.) "[Rent control] legislation may not be invalidated under the 'substantially advance' prong of takings analysis unless it 'constitutes an arbitrary regulation of property rights.' " (*Id.* at p. 972.)

In a concurring opinion, Justice Kennard stated that the Rent Control Law was valid because it was *rationally* related to a legitimate state interest. (*Santa Monica Beach, supra*, 19 Cal.4th at pp. 975-981 (conc. opn. of Kennard, J.).) In the first of three separate dissents, Justice Baxter concluded, among other things, that courts should not employ a deferential level

of scrutiny in any type of takings case. (*Id.* at pp. 995, 1005-1009 (dis. opn. of Baxter, J.).) Justice Chin stated that the determination of whether a regulation is arbitrary, while proper under the due process clause, is not pertinent under the takings clause. (*Id.* at pp. 1018-1021 (dis. opn. of Chin, J.).) And Justice Brown opined that a single level of scrutiny—heightened scrutiny—applies in all regulatory takings cases. (*Id.* at pp. 1025-1028, 1034-1035 (dis. opn. of Brown, J.).)[3]

 Here, we need not decide which level of scrutiny applies or whether there is only one level of scrutiny in regulatory takings cases. Our ultimate conclusion would be the same regardless of the resolution of those issues. It is well settled that "a regulation of property 'effects a taking if [it] does not substantially advance legitimate state interests.' " (*Kavanau, supra,* 16 Cal.4th at p. 781, quoting *Agins v. City of Tiburon* (1980) 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106]; accord, *Santa Monica Beach, supra,* 19 Cal.4th at p. 964.) The Board has not offered any state interest, much less a legitimate one, for requiring landlords to pay 3 percent interest when banks are paying a lower rate.

The purpose of the Rent Control Law is to provide an adequate supply of affordable rental housing, especially for the poor, minorities, students, young families, and senior citizens, while allowing landlords to make a fair return on their property. (See Santa Monica Charter, § 1800.) We fail to see how that purpose is served by forcing landlords to pay a higher rate of interest on security deposits than the rate prevailing in the open market. Under the Board's scheme, a security deposit is a better investment vehicle than a money market account. There is no logic, fairness, or justice in that. When economic conditions cause banks to pay less than 3 percent on deposit accounts, as is the case today, a landlord should not become a tenant's cash cow.

In sum, the Board has not offered a legitimate reason for making landlords pay 3 percent interest on security deposits. We therefore conclude that the Board's regulations do not substantially advance a legitimate state interest.

### 2. *Impact of Government Regulations*

 "When a regulation does not result in a physical invasion and does not deprive the property owner of all economic use of the property, a

---

[3]In *San Remo Hotel v. City and County of San Francisco** (Cal.App.) review granted November 21, 2000, argued December 6, 2001, S091757, the Supreme Court is considering issues regarding the level of scrutiny in takings cases.

*Reporter's Note: For Supreme Court opinion, which was filed March 4, 2002, see 27 Cal.4th 643.

reviewing court must evaluate the regulation in light of the 'factors' the [United States Supreme Court] discussed in *Penn Central* [*Transp. Co. v. New York City* (1978) 438 U.S. 104 [98 S.Ct. 2646, 57 L.Ed.2d 631] (*Penn Central*)] and subsequent cases. *Penn Central* emphasized three factors in particular: (1) '[t]he economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.' " (*Kavanau, supra,* 16 Cal.4th at p. 775; accord, *Palazzolo, supra,* 533 U.S. at p. 633 [121 S.Ct. at p. 2457].) The United States Supreme Court has also considered other factors in examining the impact of a regulation.[4]

But "[t]his list [of factors] is not a comprehensive enumeration of all the factors that might be relevant to a takings claim, and we do not propose a single analytical method for these claims. Rather, we simply note factors the high court has found relevant in particular cases. Thus, instead of applying these factors mechanically, checking them off as it proceeds, a court should apply them as appropriate to the facts of the case it is considering." (*Kavanau, supra,* 16 Cal.4th at p. 776.)

"We reach [our] conclusion [in this case] by applying the three [*Penn Central*] factors that traditionally have informed [the Supreme Court's] regulatory takings analysis." (*Eastern Enterprises v. Apfel* (1998) 524 U.S. 498, 529 [118 S.Ct. 2131, 2149, 141 L.Ed.2d 451] (plur. opn. of O'Connor, J.); see *id.* at pp. 529-537 [118 S.Ct. at pp. 2149-2153] (plur. opn. of O'Connor, J.) [applying three *Penn Central* factors]; *id.* at pp. 565-568 [118 S.Ct. at pp. 2167-2168] (dis. opn. of Breyer, J.) [same]; *Palazzolo, supra,* 533 U.S. at pp. 630 [121 S.Ct. at pp. 2457, 2464, 2465] [emphasizing *Penn Central* factors].)

 The economic impact of the regulations on landlords (the first *Penn Central* factor) can be assessed in more than one way. For instance, the amended complaint alleges that banks have been paying between .5 and 1.5 percent interest on tenants' security deposits. On average, then, landlords have been required to use their own funds to pay a significant portion of the annual sum—50 to 83 percent.

---

[4]Those factors include (1) whether the regulation affects the existing or traditional use of the property and thereby interferes with the property owner's primary expectation; (2) the nature of the state interest in the regulation and, particularly, whether the regulation is reasonably necessary to accomplish a substantial public purpose; (3) whether the government is acquiring resources to permit or facilitate uniquely public functions, such as the government's entrepreneurial operations; (4) whether the regulation permits the property owner to profit and to obtain a reasonable return on investment; and (5) whether the regulation provides the property owner with benefits or rights that mitigate whatever financial burdens the law has imposed. (See *Kavanau, supra,* 16 Cal.4th at pp. 775-776.)

Further, during the three-year period contemplated by the regulations—the Board reviews the interest rate at least every three years (Santa Monica Rent Bd. Regs., reg. No. 14001(b))—landlords, as a group, will be out of pocket $2.3 million. During that period, each landlord, on average, will use $718 of its own funds to pay all of its tenants. The individual plaintiff, Herb Balter, will pay $1,485. Over three years, landlords will contribute $82.50 per rental unit.

Although the Board views these figures as de minimis, we do not. A small taking is still a taking. And "there are additional burdens concomitant with [requiring a landlord to] account[] for interest payments. These include the costs of calculation, the time involved in explaining the calculations to the dissatisfied tenant, billing, handling, and, in the case of large management companies, the cost of computer time." (Comment, *Interest on Security Deposits—Benefit or Burden to the Tenant?, supra,* 26 UCLA L.Rev. at pp. 409-410, fn. omitted.) "[T]he administration of interest payments may create tremendous problems for small landlords who handle only a few deposits and cannot afford to spend a great deal of time on their rentals. While the large landlord may have a system whereby he can administer interest payments, the small landlord does not." (*Id.* at p. 410, fn. 70.)

As for the second *Penn Central* factor, the 3 percent interest regulations, as applied, are contrary to the landlords' reasonable investment-backed expectations. Landlords might have expected that, some day, they would have to pay security deposit interest to their tenants (see Santa Monica Charter, § 1803(s)), but they surely did not expect that the payments would exceed the interest paid by banks. Nevertheless, since January 1999, landlords have paid roughly $770,000 per year to cover the difference between the mandatory 3 percent rate and the banks' rate.

With respect to the character of the Board's action (the third *Penn Central* factor), "[t]he provision[] of the ordinance requiring that interest on security deposits be paid [by landlords at a specified rate, regardless of market conditions, is] remote . . . from any concern with the health or safety of [Santa Monica residents], the quality of housing in [Santa Monica], or the welfare of [Santa Monica] as a whole. [The ordinance's] only apparent rationale is to transfer wealth from landlords . . . to tenants—making [it] an unedifying example of class legislation . . . ." (*Chicago Bd. of Realtors, Inc. v. City of Chicago* (7th Cir. 1987) 819 F.2d 732, 741-742 (maj. opn. of Posner, J.).)

In addition, the Board's action is quite unusual, treating private landlords like banks but not allowing them to lower interest rates during an economic

downturn. As a practical matter, tenants enjoy the benefit of a three-year certificate of deposit—locking in a higher rate of interest than on other deposit accounts—without incurring the corresponding burden—a penalty for early withdrawal. Many tenants have month-to-month tenancies, terminable on 30 days' notice. (See Civ. Code, §§ 1945, 1946.) Within three weeks after a tenant vacates the premises, a landlord must (1) give the tenant an itemized statement indicating the basis for retaining any part of the security deposit and (2) refund the deposit or, where appropriate, the remaining portion of the deposit. (Civ. Code, § 1950.5, subd. (f).) As a result, landlords must keep security deposit funds relatively liquid in order to return security deposits, in whole or in part, on short notice. Yet, the Board insists that landlords pay interest on security deposits at a rate commensurate with a longer term investment.

Moreover, " '[t]he determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest.' . . . The question 'in any case where government action is challenged as violative of the right to just compensation, is whether the uncompensated obligations and restrictions imposed by the governmental action force individual property owners to bear more than a just share of obligations which are rightfully those of society at large.' " (*Cwynar, supra,* 90 Cal.App.4th at p. 651, citation omitted.)

Here, the Board has taken an investment opportunity provided by banks—the payment of interest on deposited funds—and imposed it on private landlords. " 'National banks are quasipublic institutions . . . .' " (*Mercantile Nat. Bank v. Langdeau* (1963) 371 U.S. 555, 558 [83 S.Ct. 520, 522, 9 L.Ed.2d 523]; accord, *Intrawest Financial Corp. v. Western Nat. Bank* (D.Colo. 1985) 610 F.Supp. 950, 960.) "[A] banking corporation is unlike a purely private corporation in that a banking corporation is a quasi-public institution . . . . It is a quasi-public institution in the sense that '[t]he whole stream of commerce, whether interstate or intrastate, largely depends upon [its existence].' . . . ' "[B]anks are indispensable agencies through which the industry, trade, and commerce of all civilized countries and communities are carried on; the business which they transact, though for private profit, is of a pre-eminently public nature . . . ." ' " (*In re Invol. Dissol. of Battle Creek Bank* (1998) 254 Neb. 120, 124-125 [575 N.W.2d 356, 360].)

As one of our own courts has stated: " 'Though banks are organized and financed by private individuals for personal gain, they are in a sense public institutions, subject to legislative regulation, examination and control. . . .'

. . . 'In the progress made in the industrial and economic world . . . , the business of banking has ceased to be, if . . . it ever was, a purely private enterprise. Such business affects . . . intimately the commercial welfare and business interests of the people . . . . The public patronage which the banker invites and receives is of such a character that he becomes [an observer] of the fiscal affairs of the people of the State . . . .' " (*Frankini v. Bank of America* (1939) 31 Cal.App.2d 666, 678 [88 P.2d 790], citations and italics omitted.) In fact, a bank depositor's funds are insured by an agency of the federal government, albeit with certain exceptions and caps. (See 12 U.S.C. § 1821(a)(1); Fed. Deposit Ins. Corp., Your Insured Deposit (1999).)

No doubt, the Board can compel landlords to give tenants the interest paid by the bank. But it is an entirely different matter for the Board to require that security deposits be placed in a bank and then demand that landlords pay tenants *more* than the interest earned on the account. Banks—not purely private entities like landlords—set interest rates and pay interest on deposited funds. The Board should therefore look to the banking industry, which is quasi-public in nature, to determine the appropriate interest rate.

The security deposit law in the State of New York provides an apt example. It does not specify a particular rate of interest but requires that landlords give tenants the interest paid by the bank. The landlord serves as a mere intermediary in the process. Under the statute, the landlord is entitled to keep 1 percent per year as compensation for administrative and custodial expenses. (N.Y. Gen. Oblig. Law § 7-103(2) (McKinney 2001).) The statute further states: "The *balance of the interest paid by the banking organization* shall be the money of the person making the deposit or advance and shall either be held in trust by the person with whom such deposit or advance shall be made, until repaid or applied for the use or rental of the leased premises, or annually paid to the person making the deposit of security money." (*Ibid.*, italics added.) This regulatory scheme avoids the need to amend rent control laws and regulations to reflect changes in market conditions.

In conclusion, based on the constitutional prohibition against the taking of private property for public use without just compensation, the Association has adequately pleaded a cause of action, provided the Board's contentions—which we discuss next—lack merit.

D. *The Board's Contentions*

According to the Board, the Association has not adequately pleaded a takings claim because (1) the claim is not ripe, (2) the Association did not exhaust administrative remedies, and (3) the challenged regulations did not result in a cognizable injury.

*1. Ripeness*

█ "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. . . . It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy. . . .

". . . 'The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts.' . . . 'The "actual controversy" . . . is one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. The judgment must decree, not suggest, what the parties may or may not do.' . . . 'The principle that courts will not entertain an action which is not founded on an actual controversy is a tenet of common law jurisprudence, the precise content of which is difficult to define and hard to apply. . . . A controversy is "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' " (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170-171 [188 Cal.Rptr. 104, 655 P.2d 306], citations and italics omitted.)

█ "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue. . . . [¶] . . . [¶]

"[The courts'] reluctance to examine taking claims until such a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. Although '[t]he question of what constitutes a "taking" for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty,' . . . [the Supreme] Court consistently

has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. . . . Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question. [¶] . . . [¶]

"The question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable. . . . While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." (*Williamson Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172, 186-193 [105 S.Ct. 3108, 3116-3120, 87 L.Ed.2d 126], citations omitted; accord, *Palazzolo, supra*, 533 U.S. at pp. 618-621 [121 S.Ct. at pp. 2458-2460].)

■ In this case, the issues are framed with sufficient definiteness. The challenged regulations impose an actual concrete injury: Landlords are forced to contribute their own funds to pay tenants 3 percent interest on security deposits. The controversy is real and substantial, not hypothetical. The Board arrived at a final, definitive position on the regulations some time ago, more specifically, January 1999. The regulations are sufficiently final for us to evaluate—as we have already done—the "economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations." (*Williamson Planning Comm'n v. Hamilton Bank, supra*, 473 U.S. at p. 191 [105 S.Ct. at p. 3119]; see pt. II.C.2, *ante*.) Thus, the case is ripe for decision.

## 2. *Exhaustion*

■ " 'The requirement of exhaustion of administrative remedy is founded on the theory that the administrative tribunal is created by law to adjudicate the issue sought to be presented to the court, and the issue is within its special jurisdiction. If a court allows a suit to go forward prior to a final administrative determination, it will be interfering with the subject matter of another tribunal. . . . Consequently, the requirement of exhaustion is a jurisdictional prerequisite, not a matter of judicial discretion. . . .' " (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81

Cal.App.4th 577, 589 [96 Cal.Rptr.2d 880], citations omitted; accord, *Styne v. Stevens* (2001) 26 Cal.4th 42, 56 [109 Cal.Rptr.2d 14, 26 P.3d 343].)

" 'There are several reasons for the exhaustion of remedies doctrine. "The basic purpose for the exhaustion doctrine is to lighten the burden of over-worked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the wanted relief." . . . Even where the administrative remedy may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor "because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency." . . . It can serve as a preliminary administrative sifting process . . . , unearthing the relevant evidence and providing a record which the court may re-view. . . .' " (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 501 [87 Cal.Rptr.2d 702, 981 P.2d 543], citations omitted; see *Hensler v. City of Glendale, supra,* 8 Cal.4th at pp. 11-13, 17-19, 25 [where government regulations restrict the development of real property, landowner must first pursue available administrative remedies (such as a variance or a change in permit conditions) and then seek judicial relief by way of a petition for writ of administrative mandate].)

 In the case before us, the Board argues that the Association had to seek administrative relief through (1) the general adjustment process or (2) a petition for an individual rent adjustment. Based on the pleadings, the Rent Control Law, and the Board's regulations, we cannot say at this early stage that the Association failed to exhaust administrative remedies. We begin with some general comments about exhaustion and then discuss in more detail the two remedies mentioned by the Board.

"It is settled that the rule requiring exhaustion of administrative remedies does not apply where an administrative remedy is unavailable . . . or inadequate . . . ." (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 217 [188 Cal.Rptr. 115, 655 P.2d 317], citations omitted; accord, *Automotive Management Group, Inc. v. New Motor Vehicle Bd.* (1993) 20 Cal.App.4th 1002, 1015 [24 Cal.Rptr.2d 904].) Here, we conclude that general and individual rent adjustments do not offer an available or adequate remedy.

As stated, general and individual rent adjustments are concerned solely with setting *rents.* The adjustments are not pertinent to the issue before us: the interest to be paid on security deposits. General and individual rent adjustments involve the application of numerous factors in performing a

complex assessment under the NOI formula to determine whether rents are providing a landlord with a fair return. (See pt. II.A., *ante.*)

In addition, the law applicable to rents is fundamentally different from the law governing security deposits, largely because rent is the property of the landlord, and a security deposit is the property of the tenant. (See pts. II.A., II.B., *ante.*) In light of these divergent interests in ownership, we fail to see how an administrative process for setting rents is of any value in determining the rate of return a landlord can be required to pay on a security deposit.

The Association specifically alleged in the amended complaint that "[t]he lost interest payments are not offset by any corresponding general rent increases or any other payment of monies to the landlords." Fairly read, the Association alleged that general and individual rent adjustments would not remedy the landlords' injury.

We now turn to the particular administrative remedies that, according to the Board, the Association should have pursued.

### a. *General Rent Adjustment*

In making a general rent adjustment each year, the Board conducts a public hearing and thereafter "adjust[s] upward or downward the rent ceiling for *all* controlled rental units in general and/or for *particular categories* of controlled rental units deemed appropriate by the Board." (Santa Monica Charter, § 1805(a), italics added.) For the moment, we put aside our previous observation that a general rent adjustment applies to rents and not security deposits.

Landlords can increase security deposits in limited situations. (See Santa Monica Rent Bd. Regs., reg. Nos. 14002(c), 14003(a); fn. 2, *ante.*) And there may be occasions when tenants are entitled to a reduced security deposit. (See Rent Bd. Regs., reg. No. 14003(b); fn. 2, *ante.*) But, as provided by regulation, a "general adjustment does not apply to a security deposit." (Rent Bd. Regs., reg. No. 14002(c).) Given that a general adjustment cannot be used to change the amount of a security deposit, it would be odd indeed if such an adjustment could be used to change the amount of *interest* on a security deposit.

Further, in papers filed on appeal, the Board has stated: "Nor is it likely that the Board *would ever* be called upon to consider [interest on security deposits] in *general adjustment* hearings, since landlords . . . could individually pursue rent increases . . . ." (Italics added; see pt. II.D.2.b.,

*post* [individual rent increase is inadequate remedy].) Similarly, at the hearing in the trial court on the Board's demurrer, the trial judge asked, "Is there any particular hearing procedure to address the amount of interest that is required to be paid?" Counsel for the Board replied, "No there is no separate proceeding for . . . that. It would simply be under the normal rent increase petition." (See pt. II.D.2.b., *post* [discussing petition to increase rent].)[5]

In sum, a general rent adjustment does not provide the Association with an administrative procedure for challenging the 3 percent interest regulations. But that is not to say that the Board lacks the authority to change the interest rate. The regulations expressly state that "[t]he Rent Control Board *shall* review the market interest rates *at least* every three years to determine the rate for the next three years." (Santa Monica Rent Bd. Reg., reg. No. 14001(b), italics added.) The Board therefore has the authority to review and change the interest rate at any time during a given three-year period.

### b. *Individual Rent Adjustment*

In a petition for an individual rent adjustment, a landlord relies on unique or particular circumstances that purportedly justify an increase not adequately covered by a general adjustment. A petition is filed by an *individual* landlord, not a group of landlords. (See Santa Monica Charter, § 1805; Rent Bd. Regs., reg. Nos. 4000-4112.) As a result, in order to reduce the amount of interest that landlords pay on security deposits, each of the city's 3,200 landlords would have to file its own petition.

The processing of a petition can be lengthy and costly. The petition itself, which consists of 14 pages and 6 schedules, requires considerable information and documentation. For example, a landlord must submit expert witness reports, any and all invoices, canceled checks, receipts and ledger sheets or other documentation for the base year and the current year of the petition, showing the following: (1) rents collected from all tenants; (2) the amount of other income received in the period; (3) property taxes assessed and paid; (4) amounts billed and paid for electricity, gas, water service, and trash service;

---

[5]In an unsolicited letter brief submitted after this appeal was fully briefed, the Board stated for the first time, without elaboration or authority, that the Association's members "*might* collectively approach the Board through a local landlords' organization . . . , seeking amendment of [the security deposit regulations] to adjust the interest rate in the event that interest overpayments . . . become widespread." (Italics added.) But this so-called "collective approach" sounds like a political solution, not an administrative remedy. And what a landlord *might* do is not synonymous with what a landlord *must* do to exhaust administrative remedies. Nothing in the Rent Control Law, the regulations, or the record (other than the Board's letter) even hints that a "collective approach" exists, much less that it is a means of exhaustion.

(5) amounts expended for maintenance and repair; (6) capital expenses; (7) license fees or other fees paid; (8) owner-performed labor and the applicable hourly rates; and (9) miscellaneous expenses paid. (Santa Monica Rent Bd. Regs., reg. No. 4002(c).)

A hearing examiner conducts a public hearing at which the landlord and any opponents can express their views. (Santa Monica Rent Bd. Regs., reg. Nos. 4007-4016.) Within 65 days after the filing of the petition, the hearing examiner renders a written decision (*id.*, reg. No. 4019), which is based on the NOI formula and is intended to provide the landlord with a fair return on its property (*id.*, reg. Nos. 4100-4106).

Within 10 days after the date of the hearing examiner's decision, the landlord, a tenant, or a Board member can appeal to the Board. (Santa Monica Rent Bd. Regs., reg. Nos. 4021, 4022.) A staff report is prepared that contains a written recommendation to affirm, reverse, or modify the decision of the hearing examiner. (*Id.*, reg. No. 4025.) The Board gives written notice of the place and time it will act on the appeal. (*Id.*, reg. Nos. 4024, 4026-4027.) Unless the Board decides to conduct a de novo hearing, its decision is limited to the administrative record before the hearing examiner, any information submitted in connection with the appeal, and any testimony heard by the Board. (*Id.*, reg. No. 4028.) The Board's decision must be supported by written findings of fact and conclusions of law. (*Id.*, reg. No. 4029; see generally *Kavanau, supra*, 16 Cal.4th at p. 769.)

Consistent with the process for resolving individual rent petitions (as set forth in the regulations above), the Association states in its opening brief that "[t]o prosecute [a] NOI Rent Increase petition . . . cost[s] thousands of dollars and 6 to 8 months of time." And we note—once again—that, like a general rent adjustment, a petition for an individual rent adjustment is concerned with rent, not security deposits. A petition determines whether a landlord is making a fair return under the NOI formula, not whether the interest rate on security deposits is excessive. In short, there is no available or adequate administrative remedy.

Moreover, even if a petition for an individual rent adjustment could somehow provide a means of challenging the 3 percent interest regulations, we would still conclude—for several reasons—that exhaustion is not required. (See *Sierra Club v. San Joaquin Local Agency Formation Com., supra*, 21 Cal.4th at pp. 501-502 [discussing purpose of doctrine of exhaustion of administrative remedies]; *Tiernan v. Trustees of Cal. State University & Colleges, supra*, 33 Cal.3d at p. 217 [discussing exceptions to exhaustion

doctrine]; *Public Employment Relations Bd. v. Superior Court* (1993) 13 Cal.App.4th 1816, 1827 [17 Cal.Rptr.2d 323] [same]; see *Styne v. Stevens, supra,* 26 Cal.4th at p. 58 ["purpose of the doctrine of exhaustion of administrative remedies [is] to reduce the burden on courts while benefiting from the expertise of an agency"].)

For one thing, the validity of the challenged regulations is a straightforward legal issue that needs little in the way of factual development. The challenge to the regulations also presents a dispositive question within judicial, not administrative, competence: "[A]n administrative agency is not competent to decide whether its own action constitutes a taking . . . ." (*Hensler v. City of Glendale, supra,* 8 Cal.4th at p. 16.) The Board's expertise is of no assistance here.

Further, the Board is not likely to resolve the dispute in a manner that makes judicial review unnecessary. That is so given the Board's position that the city's 3,200 landlords must file individual rent petitions, which would be separately processed to determine whether a landlord is making a fair return under the NOI formula. Yet, the issue presented—the validity of the 3 percent interest regulations—raises a single, discrete point that is not related to whether landlords are making a fair return on their property. (See pt. II.C., *ante.*) "As against the piecemeal review of [the same] issues by individual challenges to [the same regulations], the present action appears singularly economical." (*Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1567 [55 Cal.Rptr.2d 465].)

Nor will judicial resolution of the dispute impair the Board's functioning. The dispute can be efficiently and inexpensively resolved in a judicial forum. As the Association states in its opening brief, the processing of an individual rent petition "imposes a severe time and financial burden on a landlord [and] require[s] a long administrative process and a public airing of his or her entire financial condition to obtain a small increase [in rents] to offset overpayment of interest on security [deposits] held."

Finally, "[a]lthough waiver is the general rule when parties fail to exhaust their administrative remedies, we may agree to hear a case involving important questions of public policy." (*Lindeleaf v. Agricultural Labor Relations Bd.* (1986) 41 Cal.3d 861, 871 [226 Cal.Rptr. 119, 718 P.2d 106].) We therefore conclude that the Association's members did not have to pursue individual rent petitions.

3. *Injury*

The Board argues that the damage suffered by the Association's members, if any, was not sufficient to state a takings claim. The Board also

contends that the remedy sought by the Association, if granted, would lead to judicial micromanagement of the Rent Control Law. We disagree with both contentions.

### a. *Sufficiency of Damage*

According to the Board, unless the Association's members have incurred "deep financial hardship," the takings claim must fail. For that proposition, the Board relies on *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216 [32 Cal.Rptr.2d 807, 878 P.2d 566] (*20th Century Ins.*). In that case, the court addressed the validity of the Insurance Commissioner's regulations effecting rate rollbacks under Proposition 103. In upholding the regulations, the court stated:

" '[T]he only circumstances under which there is a possibility of a taking of investors' property by virtue of rate regulation is when a [regulated firm] is in the sort of financial difficulty described . . .' [as] 'deep financial hardship.' . . . The firm may experience such hardship when it does not earn enough revenue for both 'operating expenses' and 'the capital costs of the business,' including 'service on the debt and dividends on the stock,' of a magnitude that would allow a 'return to the equity owner' that is 'commensurate with returns on investments in other enterprises having corresponding risks' and 'sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.' . . . 'But absent [that] sort of deep financial hardship . . . ,' . . . 'there is no taking . . . .' . . . This follows from the fact that . . . a regulated firm may claim that a rate is confiscatory only if the rate does not allow it to operate successfully. In such circumstances, the firm is not inaptly characterized as experiencing 'deep financial hardship' as a result of the rate.

" ' "[A] company [can]not complain if the [allowed] return . . . made it possible for the company to operate successfully." ' " (*20th Century Ins., supra*, 8 Cal.4th at p. 296, citations omitted.)

We agree with the Association that its members did not have to sustain "deep financial hardship" in order to challenge the 3 percent interest regulations. Our Supreme Court has made plain in other rent control cases that two tests determine the outcome of the Association's takings claim: (1) whether the challenged regulation substantially advances a legitimate state interest; and (2) the impact of the regulation on the property owner, as determined by examining certain factors. (See *Santa Monica Beach, supra*, 19 Cal.4th at pp. 964, 967, 972; *Kavanau, supra*, 16 Cal.4th at pp. 774-776, 780-781.) *Santa Monica Beach* and *Kavanau* do not require "deep financial

hardship" to support a takings claim. "A regulation . . . may effect a taking though, as is true here, it . . . leaves the property owner some economically beneficial use of his property." (*Kavanau, supra*, 16 Cal.4th at p. 774, italics omitted.)

Properly understood, the decision in *20th Century Ins., supra*, 8 Cal.4th 216, stands for the unremarkable proposition that a regulated entity must be allowed to make a fair return on its property. (See *Santa Monica Beach, supra*, 19 Cal.4th at pp. 967, 972.) And, as previously explained, while "fair return" is the guiding principle in setting rents under the NOI formula, it is not relevant in setting a rate of return on security deposits. (See pts. II.A.-C., D.2, *ante*.)

Finally, the Board's position on "deep financial hardship" cannot be squared with *Webb's Fabulous Pharmacies, Inc. v. Beckwith* (1980) 449 U.S. 155 [101 S.Ct. 446, 66 L.Ed.2d 358] (*Webb's*) and similar decisions. In *Webb's*, a Florida statute provided that interest accruing on interpleader funds deposited in the registry of the court was the income of the clerk of court. To pay creditors, a court-appointed receiver sought the principal and interest in the court's registry. The clerk released the principal but kept the interest. The Florida Supreme Court held that the interest was "public money" belonging to the clerk.

The United States Supreme Court reversed, explaining: "The usual and general rule is that any interest on [a] . . . deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal. . . . [¶] . . . [¶]

"Neither the Florida Legislature by statute, nor the Florida courts by judicial decree, may accomplish the result the county seeks simply by recharacterizing the principal as 'public money' because it is held temporarily by the court. The earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property. The state statute has the practical effect of appropriating for the county the value of the use of the fund for the period in which it is held in the registry.

"To put it another way: a State, by *ipse dixit*, may not transform private property into public property without compensation, even for the limited duration of the deposit in court. This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent. That Clause stands as a shield against the arbitrary use of governmental power." (*Webb's, supra*, 449 U.S. at pp. 162-164 [101 S.Ct. at pp. 451-453].)

In *Webb's*, the total amount of interest was $100,000, and there were around 200 creditors. On average, each creditor was entitled to $500. (See

*Webb's, supra,* 449 U.S. at pp. 157, 158 [101 S.Ct. at p. 449].) By comparison, the landlords in Santa Monica are allegedly owed $2.3 million over a three-year period, or $718 per landlord, not including the administrative cost of handling interest payments. Herb Balter, the individual plaintiff, is owed almost $1,500 for the three-year period. Thus, this case presents a more compelling set of circumstances than *Webb's* for invoking the takings clause.

To take another example, in *Schneider v. California Dept. of Corrections* (9th Cir. 1998) 151 F.3d 1194, the California Department of Corrections permitted inmates to have "Inmate Trust Accounts" on which interest was paid, but the department did not allow the inmates to receive the interest. Instead, the interest was placed in an "Inmate Welfare Fund," which was used for the benefit, education, and welfare of all inmates under the jurisdiction of the department. A group of current and former inmates filed an action, asserting a right to the interest earned on their trust accounts. The district court dismissed the action.

The Ninth Circuit Court of Appeals reversed, stating that "[t]he 'interest follows principal' rule's common law pedigree . . . and near-universal endorsement by American courts—including California's . . . —leave us with little doubt that interest income of the sort at issue here is sufficiently fundamental that States may not appropriate it without implicating the Takings Clause." (*Schneider v. California Dept. of Corrections, supra,* 151 F.3d at p. 1201.)

In a more recent decision, *Washlefske v. Winston* (4th Cir. 2000) 234 F.3d 179, the Fourth Circuit Court of Appeals disagreed with *Schneider* and held that inmates do not have a property right to the interest earned on their wages. (*Id.* at pp. 185-186.) As the Fourth Circuit stated: "While it is true that at common law[,] interest follows principal, it does so only 'as a property right incident to the ownership of the underlying principal.' . . . Under Virginia law, . . . Washlefske had no traditional private property interest in wages 'earned' for work in prison. Because Washlefske never had a private property interest in these accounts as defined by common law, but only an interest defined by statute—a statute that gives him limited rights to those funds—he cannot claim that a property interest based on traditional principles of property law was taken." (*Ibid.*) Consequently, since the inmates had no property right in their wages (the principal), they had no right to the interest earned on wages.

Significantly, neither *Schneider* nor *Washlefske* indicated, or even suggested, that the plaintiffs had to allege a deep financial hardship—or, for that

matter, any threshold of financial harm—to state a viable takings claim. "The fact that [the 3 percent interest requirement] does not cause a complete economic property loss does not preclude . . . plaintiffs from establishing a regulatory taking." (*Cwynar, supra*, 90 Cal.App.4th at p. 665.)

b. *Micromanagement of Rent Control*

" 'The economic judgments required in rate proceedings are often hopelessly complex . . . . The Constitution is not designed to arbitrate these economic niceties.' . . . [C]ourts do not 'examine[] piecemeal' the 'subsidiary aspects of [a state agency's] ratemaking methodology' . . . , and flexibility in one part of a regulatory scheme may offset restrictiveness in another . . . ." (*Kavanau, supra*, 16 Cal.4th at p. 778.)

In *20th Century Ins., supra*, 8 Cal.4th 216, the court stated: "The crucial question under the takings clause is whether the rate set is just and reasonable. . . . If it is not just and reasonable, it is confiscatory. . . . If it is confiscatory, it is invalid. . . . 'The economic judgments required in rate proceedings . . . do not admit of a single correct result. . . . And, of course, courts are not equipped to carry out such a task.' . . . '[S]o long as rates as a whole afford [the regulated firm] just compensation for [its] over-all services to the public,' they are not confiscatory. . . . That a particular rate may not cover the cost of a particular good or service does not work confiscation in and of itself. . . . In other words, confiscation is judged with an eye toward the regulated firm as an enterprise." (*Id.* at pp. 292-293, citations omitted.)

The concern expressed in *20th Century Ins., supra*, 8 Cal.4th 216, that courts will attempt to micromanage ratemaking schemes is not present in this case. The sole question before us is whether, for purposes of a demurrer, the Association has stated a valid takings claim by alleging that landlords cannot be forced to pay 3 percent interest on security deposits while banks pay a lower rate. The challenged regulations are not the product of a hopelessly complex process. Nor is the Association mounting a piecemeal assault on the Board's methodology. On the contrary, the inquiry into the validity of the 3 percent interest regulations is quite narrow; it does not involve the NOI formula or the substantial data analyzed under that formula. If anything, it is the *Board's* position—requiring all 3,200 landlords to file separate rent petitions—that would result in piecemeal litigation.

Under *20th Century Ins., supra*, 8 Cal.4th 216, the issue here is whether the mandatory 3 percent rate is confiscatory and therefore invalid. That issue *does* "admit of a single correct result." (*Id.* at p. 293.) Its resolution is not

beyond the competence of the courts. And, as already discussed, while it is appropriate to treat an enterprise (a landlord's business) as a whole when determining whether the owner is making a fair return, that type of analysis is not applicable in deciding whether the interest rate on security deposits—the *tenants'* profit—is excessive. (See pts. II.A.-C., D.2, *ante.*)

We think the cautionary language in *20th Century Ins.* can best be understood by examining one of the cases on which the court relied, *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 [278 Cal.Rptr. 614, 805 P.2d 873]. (See *20th Century Ins., supra,* 8 Cal.4th at pp. 293, 316, fn. 26.) There, the defendant landlords excluded as prospective tenants anyone whose monthly income was not equal to or greater than three times the rent. The plaintiffs, female heads of low-income families, could afford the rent but did not satisfy the income requirement. They filed suit under the Unruh Civil Rights Act, which generally prohibits arbitrary conduct by business establishments, including landlords. (See Civ. Code, § 51, subd. (b); *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 724-725, 734 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161].)

In finding the action to be without merit, our Supreme Court stated: "According to plaintiffs, landlords are required by the Unruh Act to make individualized determinations of each prospective tenant's ability to pay rent without the use of a minimum income policy that screens out a particular group of persons based on income. [¶] . . . [¶]

". . . [P]laintiffs' view of the Act would involve the courts of this state in a multitude of microeconomic decisions we are ill equipped to make. The parties agree defendants have a legitimate interest in screening out tenants who are unable to pay rent regularly and on time throughout the tenancy. . . . [T]he parties differ primarily with respect to what criteria should be used (and in what combinations and permutations) to screen out persons who are likely to default. Plaintiffs appear to favor payment history; defendants favor income.

"A trial in such a case would explore issues such as what general tenant selection criteria are the best predictors of default; what weight should be given to each criterion; what threshold criteria, if any, are permissible; and what must be shown and by whom to validate general or threshold criteria. . . . [T]he issue of what criteria could be used by landlords could be tried and retried across the state as an issue of fact, with no prospect of certainty or stability in the respective rights and duties of the parties." (*Harris v. Capital Growth Investors XIV, supra,* 52 Cal.3d at pp. 1165-1166.)

The present case raises none of the thorny economic issues faced in *Harris*. Quite the opposite, all of the Association's members want to be treated alike. Their challenge to the 3 percent interest requirement seeks a single, objective outcome for everyone. The interest rate paid by banks can be easily determined. If the mandatory 3 percent rate is too high, the court can fashion a simple remedy to right the wrong.

In closing, we note that, under the Rent Control Law, a tenant has an administrative avenue—a petition for an individual rent adjustment—to seek a reduction in rent, that is, to reduce a landlord's profit. (Santa Monica Rent Bd. Regs., reg. Nos. 4001, 4001A.) But no administrative process is accorded a landlord who wants to reduce the interest it pays on security deposits. In the circumstances of this case, we conclude that the Association can seek that form of relief under the takings clause. Logic, fairness, and justice compel our decision.

E., F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III

#### DISPOSITION

The order sustaining the demurrer without leave to amend and the judgment dismissing the action are reversed. Plaintiffs are entitled to costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

On January 3, 2002, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied March 20, 2002. Brown, J., did not participate therein.

---

*See footnote, *ante*, page 587.